Filed 5/19/22  P. v. Gonzalez CA6
On rehearing

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046836 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 214496) |
| v. | |
| JAMES GONZALEZ, | |
| Defendant and Appellant. | |

A multi-agency police investigation into drug trafficking and other crimes committed in Santa Clara County by Norteño criminal street gangs, operating under the umbrella of the Nuestra Familia prison gang, led to the indictment of appellant James Gonzalez and 23 others.  A jury convicted Gonzalez of numerous crimes including street terrorism, attempted murder, assault with a deadly weapon, dissuading a witness or victim by force, robbery, burglary, criminal threats, conspiracy, possession of methamphetamine for sale, and illegal possession of a firearm by a felon.  The jury also found true several sentence enhancements.  The trial court sentenced Gonzalez to 14 years to life in prison, consecutive to 38 years.

On appeal, Gonzalez raises 16 claims of error.  Stated broadly, he challenges the sufficiency of the evidence for his robbery and conspiracy convictions, certain jury

instructions, evidentiary rulings, the failure to bifurcate trial on the gang sentence enhancement allegations, and rulings on his motion for new trial, and his sentence.[1]

For the reasons explained below, we reverse the convictions for street terrorism (count 1), criminal threats (count 11), and conspiracy (counts 12 & 13). We also reverse the true findings on several of the gang enhancement allegations (counts 5–11). Accordingly, we vacate Gonzalez's sentence in its entirety and remand the matter for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Procedural History*

In March 2015, the grand jury of Santa Clara County returned a 34-count indictment charging appellant Gonzalez, codefendant Carlos Roman, and 22 other individuals.[2] In December 2017, the Santa Clara County District Attorney filed a third amended indictment (hereafter indictment) against the same 24 people. That indictment alleged 14 crimes against Gonzalez: Street terrorism (Pen. Code, § 186.22, subd. (a)[3]; count 1), attempted murder (§§ 187, 664, subd. (a); count 5), assault with a deadly weapon (§ 245, subd. (a)(1); count 6), dissuading a witness or victim by force or threat (§ 136.1, subd. (c)(1); counts 7 & 8), robbery (§ 211; count 9), burglary (§ 460, subd. (a);

---

[1] We originally filed an opinion in this case on April 19, 2022. Thereafter, on May 9, 2022, we granted Gonzalez's petition for rehearing, which sought rehearing to address a claim (not raised in Gonzalez's prior briefing) that under Penal Code section 1109, the failure to bifurcate the gang sentence enhancement allegations requires reversal of his convictions. We provided the parties the opportunity to stand on their rehearing briefs or submit supplemental briefing. Gonzalez submitted a supplemental letter brief. The Attorney General asked us to treat his answer to the petition for rehearing as his brief on the merits. Our grant of the petition for rehearing vacated our prior opinion, and this opinion constitutes the opinion of this court in this matter. (See *People v. Murphy* (1980) 108 Cal.App.3d 475, 478.)

[2] Gonzalez and Roman were ultimately tried together. Roman was convicted on three counts, and this court has already decided Roman's direct appeal. (See *People v. Roman* (Mar. 10, 2021, H046210) [nonpub. opn.].)

[3] Unspecified statutory references are to the Penal Code.

2

count 10), criminal threats (§ 422; count 11), conspiracy to sell methamphetamine (§ 182, subd. (a)(1); Health & Saf. Code, § 11379, subd. (a); count 12), conspiracy to sell marijuana (§ 182, subd. (a)(1); Health & Saf. Code, § 11360, subd. (a); count 13), conspiracy to bring contraband into a custodial facility (§§ 182, subd. (a)(1), 4573; count 14), possession of methamphetamine for sale (Health & Saf. Code § 11378; count 15), and illegal possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 16 & 17).

The indictment further alleged as to all counts except count 1, that Gonzalez's crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)); as to counts 5 and 6, that Gonzalez personally inflicted great bodily injury (§§ 12022.7, subd. (a), 1203, subd. (e)(3)); as to count 5, that Gonzalez personally used a deadly weapon (§ 12022, subd. (b)(1)); as to counts 7, 8, and 10, that a principal was armed with a firearm (§ 12022, subd. (a)(1)); as to count 9, that Gonzalez was a principal in the charged crime and a principal personally used a firearm (§ 12022.53, subds. (b), (e)(1)); as to counts 12 and 15, that the quantity of methamphetamine exceeded one kilogram (Health & Saf. Code § 11370.4, subd. (b)); and as to count 15, that Gonzalez personally was armed with a handgun (§ 12022, subd. (c)).

In January 2018, the jury found Gonzalez guilty as charged, including that the robbery in count 9 was in the first degree. The jury also found all of the sentence enhancement allegations true except for the firearm enhancement in count 9.

Following the jury's verdict, Gonzalez, through new defense counsel, filed a motion for new trial. Pursuant to the motion, the trial court found there was insufficient evidence to support the guilty verdict on count 14 for conspiracy to bring contraband into a custodial facility. The court thus vacated that conviction. The court also ordered the first degree robbery conviction on count 9 reduced to second degree robbery, finding that the jury should not have been permitted to convict Gonzalez on a degree of robbery that had not been charged in the indictment.

3

In March 2019, the trial court sentenced Gonzalez to an aggregate determinate sentence of 36 years. That sentence included the upper term of nine years for attempted murder (count 5), and consecutive terms of one year and four months for first degree burglary (count 10), eight months for criminal threats (count 11), one year for each conspiracy (counts 12 & 13), and eight months for each firearm possession (counts 16 & 17). Pursuant to section 654, the court stayed the determinate terms imposed on count 1 (upper term of three years), count 6 (upper term of four years), and count 15 (middle term of two years). The court also ordered that the three-year determinate term imposed on count 9 run concurrently.

As for the sentence enhancement allegations, the trial court imposed consecutive terms of one year for the gang enhancements attendant to counts 12, 13, 16, and 17; consecutive terms of one year and eight months for the gang enhancements attendant to counts 10 and 11; a consecutive term of four months for the arming enhancement attendant to count 10; and, on count 5, consecutive terms of three years for the great bodily injury enhancement, one year for the deadly weapon enhancement, and 10 years for the gang enhancement.

Consecutive to the determinate sentence, the trial court imposed for counts 7 and 8 consecutive indeterminate terms of seven years to life (for a total of 14 years to life) plus consecutive one-year terms (for a total of two years).

Gonzalez timely appealed.

*B. Factual Overview*

The evidence at trial generally concerned three subjects. One topic related to Gonzalez's involvement in drug dealing and other activity with Norteño gang members between January 2013 and October 2014. Another concerned Gonzalez's stabbing of Curtis Garza in January 2013 over a drug debt Garza owed to Gonzalez. The third topic related to a November 2013 home invasion committed by Gonzalez and two other gang

4

members to obtain a letter that indicated Gonzalez had been keeping drugs and money in a safe at a friend's home.

As described above, the prosecution of Gonzalez was part of a larger investigation into gang activity in Santa Clara County. Detective Justin Harper was the lead investigator in the case against Gonzalez and testified as an expert in "criminal street gangs, the Nuestra Familia, controlled substance recognition, usable amounts of controlled substances, and sales of controlled substances." He testified that, while the organizational structure of the Nuestra Familia (NF) prison gang has changed over the years, everyone within the gang during the relevant time period for this case was considered a Norteño regardless of rank. The highest-ranking NF members ("carnals") "put[] people in place out on the streets . . . to bring all the Norteño criminal street gangs within [a] region [] under the NF umbrella." Detective Harper used the descriptor "Norteño criminal street gang interchangeably with the Nuestra Familia" because, under "new [NF] directives," "everybody's a Norteño."

The primary activities of the NF/Norteños included homicides, attempted murders, kidnappings, extortion, assaults with deadly weapons, drug sales, robbery, burglary, prostitution, and identity theft. Individual Norteño gangs in a given region were required to pay a monthly tax of $200 or $250 to the regional "street regiment." The street regiment also imposed a 25 percent tax on all illegal activity within their region. The money generated from all these taxes was placed in a "regiment bank" and "reinvest[ed] [] into guns, into drugs, and other illegal endeavors to make a profit." Ultimately, the profits were "funnel[ed] [] back into the county jails and the state prison system," to support the carnals, along with "contraband, narcotics[, and] . . . cell phones, so that the carnals could have open lines of communication out on the streets." Detective Harper testified that there were "probably more than 100 [Norteño street gangs] . . . within San Jose," all of which the NF sought to control. The San Jose gangs fell under the authority

5

of the NF street regiment assigned to Santa Clara County. Street regiments were "made up of trusted members from multiple different Norte[ñ]o gangs."

Detective Harper opined that Gonzalez was a Norteño gang member between January 1, 2013, and October 30, 2014, based on Gonzalez's prison records, identification of Gonzalez as someone who worked under gang member Frank Cruz, Gonzalez's authorship of reports to NF leadership, that Gonzalez was tasked by the regiment to oversee a street gang and eventually took on a leadership role in the regiment, Gonzalez's tattoos, and the clothing and gang-related paperwork found by police in Gonzalez's residence.

Gonzalez did not testify or present any witnesses to the jury. Roman, too, did not testify at trial, but he did present some evidence related to him by way of a stipulation.

## II. DISCUSSION

Gonzalez raises 16 claims of error. For ease of exposition, we have grouped the issues primarily by the procedural phase of the trial to which they correspond.

A. *Pre-trial Evidentiary Rulings*

With respect to evidentiary error, Gonzalez contends the trial court erred by (1) allowing evidence of Gonzalez's attack on Arlindo Silva and (2) denying Gonzalez's request for a separate trial and choosing instead to redact portions of codefendant Roman's out-of-court statements to police.

1. Gonzalez's Attack on Arlindo Silva

The district attorney presented evidence that in December 2015, pending trial, Gonzalez beat fellow gang member Arlindo Silva with waist-chain restraints while the two were in a courthouse holding cell. Gonzalez objected to this uncharged-misconduct evidence under Evidence Code section 352.[4]

---

[4] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its

On appeal, Gonzalez contends the trial court abused its discretion and violated his due process rights by allowing evidence about this attack. Gonzalez asserts that the probative value of the evidence was substantially outweighed by the danger of undue prejudice and rendered his trial fundamentally unfair. He argues the probative value was "severely limited" because "the incident occurred so long after the dates of the charged offenses" and the evidence was cumulative. He further maintains that the attack on Silva was "particularly prejudicial" because "it was the same crime (assault with a deadly weapon)" for which he was charged in count 6 (involving Curtis Garza).

### a. Legal Principles

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Evidence of crimes or misconduct committed after the charged crimes may be relevant. (See *People v. Balcom* (1994) 7 Cal.4th 414, 425–426.) " ' "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 947 (*Jones*); see also Evid. Code, §§ 210, 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*).)

"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*).)

Evidence Code section 352 " 'requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses

admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

7

an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' " (*Jones*, *supra*, 57 Cal.4th at p. 948.) " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Id.* at p. 949.)

"An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman*, *supra*, 60 Cal.4th at p. 74.)

### b. Analysis

We are not persuaded that the trial court erred by admitting evidence of Gonzalez's attack on Silva. Gonzalez believed Silva was a "snitch" and Gonzalez tried to get "charges brought" within the NF against Silva. The attack was relevant to show Gonzalez's prolonged and enduring membership and active participation in the NF/Norteño gang, his intent to benefit the gang by his criminal conduct, and his loyalty to the gang. That the attack occurred around 13 months after the last date alleged in the indictment (i.e., October 30, 2014) does not significantly reduce the attack's probative value. (See *People v. Spector* (2011) 194 Cal.App.4th 1335, 1388; see also *Ewoldt*, *supra*, 7 Cal.4th at p. 405.) The attack also was not cumulative because it was relevant to issues that otherwise were disputed by Gonzalez at trial. (See *id.* at p. 406.)

Furthermore, the evidence was not unduly prejudicial because the testimony about the attack was relatively brief and not particularly graphic or detailed. Thus, the evidence was not of such a nature that it would inflame the emotions of the jurors or mislead them from their task of deciding whether the district attorney proved Gonzalez's guilt of the charged crimes. (See *People v. Cowan* (2010) 50 Cal.4th 401, 475; *People v. Bolin* (1998) 18 Cal.4th 297, 320.) Moreover, although there is an inherent risk of prejudice with evidence of uncharged misconduct (see *Ewoldt*, *supra*, 7 Cal.4th at p. 404), the

8

probative value of the evidence here is significant and the trial court instructed the jurors not to conclude from the "evidence of gang activity" that "the defendant is a person of bad character or that he has a disposition to commit crime." We presume that the jurors followed the court's limiting instruction. (*People v. Case* (2018) 5 Cal.5th 1, 32.)

Likewise, there was no violation of Gonzalez's constitutional rights to due process. The admission here of probative evidence was both appropriate and unexceptional, and it did not render Gonzalez's trial fundamentally unfair. (See *Jones*, *supra*, 57 Cal.4th at p. 949; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 26; *Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 920.)

For these reasons, we conclude the trial court did not abuse its discretion in admitting the evidence of Gonzalez's attack on Silva; we also decide no constitutional violation occurred.

### 2. Codefendant Roman's Out-of-Court Statement to Police

Gonzalez contends the trial court erred and prejudicially violated his right to confrontation when it denied his request for a separate trial and chose instead to insufficiently redact and admit into evidence portions of Roman's out-of-court statements to police.

#### a. Background

Gonzalez moved in the trial court for a severance and separate trial from codefendant Roman based on the district attorney's intent to admit Roman's out-of-court statements to police. Gonzalez maintained that a joint trial would deprive him of his constitutional rights to confront witnesses and to due process under *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) and also would violate principles set forth in section 1098 and *People v. Aranda* (1965) 63 Cal. 2d 518 (*Aranda*). Gonzalez argued that the detailed statements Roman made to Detective Justin Harper (the lead investigator and prosecution's gang expert) inculpating Gonzalez could not be effectively redacted from the interview given their nature and content. The district attorney opposed Gonzalez's

9

motion, arguing, among other things, that Roman's statements could be admitted with appropriate redaction.

Pretrial, the trial court and parties reviewed Roman's recorded interview line-by-line, and the court order certain redactions and modifications to Roman's statements. The trial court then denied Gonzalez's motion.[5]

Gonzalez highlights for this court certain statements that were admitted into evidence. The pinpointed statements include Roman's assertions (1) about getting "dope" from an unidentified male gang member (whom Roman had referred to as "he" during this portion of the interview), (2) that Roman found out a person (who is referred to as "he," pursuant to a redaction of Gonzalez's gang moniker from the original statement) was operating in the NF/Norteños regional street regiment after Roman started dealing with him, and (3) that Roman had dealings with gang members Arlindo Silva, Raymond Garcia, and Lorenzo Guzman.

Gonzalez also notes that Detective Harper testified—in accord with Roman's statements—that Roman had admitted to buying "dope from someone that could have gotten him caught up in a gang case" and to buying methamphetamine from someone he knew to be a member of a NF street regiment.

In its final instructions to the jury, the trial court instructed that the evidence of Roman's out-of-court statements could only be considered "against him, not against defendant James Gonzalez."

b. Legal Principles

"There is a statutory preference for joint trials of jointly charged defendants. (§ 1098.) ' "The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. [Citations.] Additionally, severance

---

[5] The trial court also denied Roman's own motion for a separate trial.

may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " ' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1048.)

Relatedly, the confrontation clause of the Sixth Amendment to the United States Constitution provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' (U.S. Const., 6th Amend.) As the United States Supreme Court recognized in *Bruton* . . . and as [our high court] recognized in [*Aranda*], . . . admitting in a joint trial out-of-court statements made by a nontestifying codefendant that incriminate the defendant poses a severe 'hazard' to the defendant's confrontation rights. [Citation.] For that reason, courts 'cannot accept limiting instructions as an adequate substitute for [the] constitutional right of cross-examination.' "[6] (*People v. Mendez* (2019) 7 Cal.5th 680, 700–701.)

"The United States Supreme Court 'limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 [(*Richardson*)] . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. [Citation.] That is because, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 874.)

---

[6] The parties agree that Roman's statements to Detective Harper are "testimonial" hearsay for the purposes of Gonzalez's confrontation clause claim. We concur. (See *People v. Cortez* (2016) 63 Cal.4th 101, 129; *People v. Hopson* (2017) 3 Cal.5th 424, 432.)

Whether editing a statement to retain references to a coparticipant in the crime but remove references to the coparticipant's name will "sufficiently protect[] a nondeclarant defendant's constitutional right of confrontation may not be resolved by a 'bright line' rule of either universal admission or universal exclusion. Rather, the efficacy of this form of editing must be determined on a case-by-case basis in light of the other evidence that has been or is likely to be presented at the trial. The editing will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun." (*People v. Fletcher* (1996) 13 Cal.4th 451, 456 (*Fletcher*).) "When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause." (*People v. Burney* (2009) 47 Cal.4th 203, 231 (*Burney*).) If a codefendant's confession cannot be edited to avoid a violation of the defendant's confrontation rights, "severance is required." (*Ibid.*)

We review de novo a claim of entitlement to severance involving a trial court's decision to redact a nontestifying codefendant's statement under the *Aranda*/*Bruton* doctrine. (*People v. Washington* (2017) 15 Cal.App.5th 19, 26.)

c. Analysis

Gonzalez concedes that he was not mentioned by name in any of Roman's admitted, edited statements. Nevertheless, Gonzalez contends that Roman's statements referred to a regiment member selling drugs and Gonzalez was one of "just a handful of individuals who actually were members of the regiment." Gonzalez further asserts that even if Roman's statements were sufficiently redacted to avoid incriminating him directly in the sale of drugs, "they nonetheless were incriminating because they still established the existence of a NF regiment that was involved in a conspiracy to sell drugs."

12

We are not persuaded by Gonzalez that the introduction of Roman's edited statements violated Gonzalez's constitutional right to confrontation. The jury heard evidence that the street regiment, over time, comprised multiple and different members from various Norteño gangs. Roman's edited statements did not obviously refer to or implicate Gonzalez, and a reasonable juror could have concluded from the challenged statements that Roman was referring to a person who was not Gonzalez but some other member of the street regiment. Thus, Roman's edited statements do not violate the confrontation clause. (See *Burney*, *supra*, 47 Cal.4th at pp. 231–232; *People v. Lewis* (2008) 43 Cal.4th 415, 467 (*Lewis*); *Fletcher*, *supra*, 13 Cal.4th at p. 466.)

Further, there is no merit to Gonzalez's additional assertion that Roman's admitted statements violated Gonzalez's right to confrontation because the statements incriminated him generally with regard to the regiment's conspiracy to sell drugs. Such general statements do not implicate Gonzalez's constitutional rights. "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." (*Richardson*, *supra*, 481 U.S. at p. 206.) *Bruton* recognized a narrow exception to the power of a limiting instruction when a nontestifying codefendant's statements "powerfully incriminate the defendant on their face because they directly implicate the defendant by name or do so in a manner the jury could not reasonably be expected to ignore." (*Lewis*, *supra*, 43 Cal.4th at p. 506; see also *Richardson*, at p. 207; *Gray v. Maryland* (1998) 523 U.S. 185, 195–196.)

Here, Roman's statements about his dealings with other NF/Norteño gang members did not place any incriminating focus on Gonzalez. Like the situation addressed in *Richardson*—where the codefendant's confession was not incriminating on its face and became so only when linked with evidence introduced later at trial (*Richardson*, *supra*, 481 U.S. at p. 208)—it is a "less valid generalization" that Gonzalez's jurors would have disobeyed the trial court's instruction to disregard

13

Roman's statements when determining Gonzalez's guilt. (*Ibid.*) We thus conclude that the challenged statements fall outside the ambit of the *Aranda/Bruton* exception and Gonzalez's assertion regarding incrimination in the drug conspiracy fails to demonstrate a violation of the confrontation clause. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1177, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 (*Rangel*); *People v. Mitcham* (1992) 1 Cal.4th 1027, 1047.)

For these reasons, we decide the trial court did not err in denying Gonzalez's motion for a severance and separate trial or by admitting Roman's edited out-of-court statements to police.

B. *Jury Instructions*

With respect to instructional error, Gonzalez contends (1) the trial court erred by failing to instruct on whether there was a single conspiracy; (2) the trial court erred by failing to instruct on the lesser included offense of attempted criminal threat; (3) the trial court erred by failing to instruct on all of the elements for witness or victim dissuasion; (4) the trial court erred by including felonies that did not qualify as felonious criminal conduct in its instruction on street terrorism; and (5) the jury instructions for the gang enhancements on counts 5–11 did not satisfy recent, retroactively applicable changes made to section 186.22 by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333).

As described below, we agree that the trial court erred in the instructions identified by Gonzalez on appeal. Nevertheless, we conclude only the errors in the instructions for conspiracy (counts 12 and 13), criminal threats (count 11), and street terrorism (count 1) require vacatur of Gonzalez's convictions for those crimes. We further decide that the district attorney is not barred from retrying those crimes. We also decide that the changes made to section 186.22 by Assembly Bill 333 require reversal of the true findings on the gang enhancement allegations attached to counts 5–11 and that the district attorney may retry the allegations.

14

1. Conspiracy

At trial, Gonzalez did not request that the jury be instructed to decide the number of conspiracies proven by the prosecution. However, on appeal, Gonzalez contends the trial court erred by not sua sponte instructing the jury to decide whether, as a matter of fact, there was a single conspiracy underlying counts 12 and 13. Alternatively, Gonzalez asserts that his trial counsel provided constitutionally ineffective assistance of counsel by failing to request an instruction on the number of conspiracies.

The Attorney General counters that the trial court did not have a sua sponte duty to instruct on the number of conspiracies because "the question of whether multiple conspiracies or a single conspiracy exists is not a factual one for the jury." The Attorney General argues further that Gonzalez forfeited his claim of error and has failed to demonstrate any ineffective assistance of counsel. In addition, the Attorney General concedes the following: "We do not assert [], on this record, that there was conclusive evidence of either of a single, or multiple, conspiracies. [Citation.] Accordingly, should this Court rule that the instruction was required, [this court's decision in *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1223 (*Jasso*)] ruled that the proper remedy would be to remand the case to the trial court for further proceedings."

a. Procedural Background

In count 12, Gonzalez and 16 other people were charged with conspiring to sell methamphetamine on or about and between January 1, 2013, and October 30, 2014. In count 13, Gonzalez and four others—who also were charged in count 12—were accused of conspiring to sell marijuana during the same period. Additionally, the four overt acts alleged in each count were nearly identical, except that two of the four overt acts in each count involved different but overlapping groups of people; two overt acts in each count respectively specified the different drug relevant to that count (i.e., methamphetamine or marijuana); and one overt act in each count respectively referenced "the sale of methamphetamine" or "the sale of drugs."

15

The prosecution presented evidence through numerous witnesses regarding the structure and activities of the NF/Norteños during the relevant period. The witnesses included Detective Harper and five witnesses who had been part of the NF/Norteños before cooperating with law enforcement, Ulises Jimenez, Aaron Mendoza, Jacob Dominguez, Joshua Morreira, and Albert Lee.[7] The witnesses described the gang's and Gonzalez's involvement in the sale of methamphetamine and marijuana.

The trial court gave the jury several instructions related to the conspiracy counts. The instructions under CALCRIM No. 415 described each of the three conspiracies charged in counts 12, 13, and 14 as separate conspiracies and separately instructed the jury on the elements for each count. The court further provided instructions on the underlying crimes of selling methamphetamine, selling marijuana, and bringing contraband into a jail facility. In addition, the court instructed with CALCRIM No. 3515, which told the jury that each of the counts charged is a separate crime. None of the instructions gave the jurors the authority to decide that only one conspiracy existed.

### b. Analysis

We turn first to the question whether the trial court had a sua sponte duty to instruct on the number of conspiracies in this case. " '[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence.' [Citation.] [¶] California courts are divided on whether a trial court has a sua sponte duty to instruct the jury to determine how many conspiracies were committed. [Citation.] Most decisions, including the most recent cases, have held that the trial court has a duty to instruct the jury to determine the number of conspiracies committed where there is evidence to support alternative findings." (*People v. Kopp* (2019) 38 Cal.App.5th 47, 84 (*Kopp*),

---

[7] The five witnesses had pleaded guilty to criminal charges leveled against them. They did not receive any promises from law enforcement on the outcome of their cases but testified under a grant of immunity.

16

review granted on another issue Nov. 13, 2019, S257844; see *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1668–1669 (*Meneses*); see also *People v. Williams* (2015) 61 Cal.4th 1244, 1270.)  Those decisions include two by different panels of this court.  (See *Jasso*, *supra*, 142 Cal.App.4th at p. 1220; *People v. Vargas* (2001) 91 Cal.App.4th 506, 554 (*Vargas*).)

In *Vargas*, this court stated:  "A trial court is required to instruct the jury to determine whether a single or multiple conspiracies exist only when there is evidence to support alternative findings."  (*Vargas*, *supra*, 91 Cal.App.4th at p. 554.)  In *Jasso*, this court explained further:  "Specifically, an instruction is warranted where the evidence could support a finding that there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy."  (*Jasso*, *supra*, 142 Cal.App.4th at p. 1220.)  The defendant in *Jasso* did not request an instruction on the number of conspiracies at trial, and the Attorney General "d[id] not argue that the court has no duty to give such an instruction."  (*Ibid*., fn. 5.)

In the present case, we are not persuaded by the Attorney General to reject the reasoning of our colleagues in *Vargas* and *Jasso* on the duty to instruct in favor of an earlier approach taken by other Courts of Appeal in *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133, and *People v. McLead* (1990) 225 Cal.App.3d 906, 921 (*McLead*).  We agree with the Court of Appeal in *Kopp* "that the better reasoned decisions are those concluding that the number of conspiracies is a question of fact and imposing a duty upon the trial court to instruct the jury, sua sponte, to determine the number of conspiracies 'where the evidence supports alternative findings.' "[8]  (See *Kopp*, *supra*, 38 Cal.App.5th at p. 85, review granted.)

---

[8] We note that CALJIC contains an instruction titled "Conspiracy—Issue Whether One or Several Conspiracies" (CALJIC No. 17.05).  CALCRIM, however, does not include a corresponding instruction.  To aid our trial courts in dealing with this potential issue, the Advisory Committee on Criminal Jury Instructions may wish to consider adding an instruction like CALJIC No. 17.05 to CALCRIM.

17

Having concluded that the trial court had a sua sponte duty to instruct the jury to determine the number of conspiracies if the evidence could support a finding of a single conspiracy, we must next decide whether such evidentiary support exists in this case. As noted above, the Attorney General concedes that there is support in this record for the instruction Gonzalez proposes and the failure to instruct on the number of conspiracies was prejudicial to Gonzalez. Based on our review of the record, we accept the Attorney General's concession and conclude the trial court prejudicially erred by failing to instruct the jury to decide whether there was one or more conspiracies underlying counts 12 and 13.[9]

### c. Remedy

In light of this conclusion that prejudicial error occurred and Gonzalez's separate claim that there was insufficient evidence to show the existence of more than one conspiracy, we must ascertain whether there is sufficient evidence to support both conspiracy convictions, such that the district attorney may have the option following remand of retrying both conspiracy counts. (See *Jasso*, *supra*, 142 Cal.App.4th at p. 1223.)

"A conspiracy consists of two or more persons conspiring to commit any crime. (§ 182, subd. (a).) 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy. [Citations.] [¶] Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy.' " (*People v. Joseph* (2021) 63 Cal.App.5th 1058, 1065.) However, "[c]ommission of the target offense in furtherance of the conspiracy satisfies the overt act requirement."

---

[9] Given our conclusion on the merits of Gonzalez's claim, we need not address the alternative issue of ineffective assistance of counsel.

(*People v. Jurado* (2006) 38 Cal.4th 72, 121.)  Moreover, "[t]he act of one conspirator is the act of all.  Each is responsible for everything done by his coconspirators, including those things that follow as the probable and natural consequence of the execution of the conspiracy." (*People v. Zacarias* (2007) 157 Cal.App.4th 652, 657.)  "It is well-settled that the essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies." (*Meneses*, *supra*, 165 Cal.App.4th at p. 1669.)

" 'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result." ' [Citation.]  'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims." (*Meneses*, *supra*, 165 Cal.App.4th at p. 1672, quoting *McLead*, *supra*, 225 Cal.App.3d at p. 920; *ibid*. ["[T]hese factors are not determinative, and we may consider other facts."].) " ' "Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement.' [Citation.]  The general test also comprehends the existence of subgroups or subagreements." ' " (*Kopp*, *supra*, 38 Cal.App.5th at p. 84, review granted.)

We consider the question whether multiple conspiracies have been proved as an issue of the sufficiency of the evidence.  (See *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 419, disapproved of on other grounds by *People v. Valencia* (2021) 11 Cal.5th 818; see also *United States v. Montgomery* (9th Cir. 1998) 150 F.3d 983, 990.)  We review the entire record in the light most favorable to the verdict to determine whether it contains substantial evidence supporting the conviction.  (See *People v. Powell* (2018) 5 Cal.5th 921, 944 (*Powell*).)

19

Gonzalez argues that the NF only had one objective in selling methamphetamine and marijuana, i.e., "to generate revenue." He acknowledges that "methamphetamine appears to have been the main drug that made the most money for the NF" and "[m]arijuana appears to have been a secondary drug," but he contends "only one crime was intended – the sale of drugs; the only difference being the type of drug." In support of his argument, Gonzalez points to the similarity of the overt acts alleged in the indictment and statements made by Detective Harper in his testimony and the prosecutor in his closing argument about the NF's sale of drugs.[10]

We conclude there is sufficient evidence for a finding of more than one conspiracy under counts 12 and 13. Generally speaking, drug dealers—be they gang members or not—sell drugs because they want to make money. Hence, the fact that NF members had the universal objective of generating revenue through drug sales does little to bolster Gonzalez's argument that there was a single conspiracy here. Mindful of the universality of the goal of drug dealing, we examine the record for evidence about the way the NF executed its operations to sell methamphetamine and marijuana. (See *Meneses*, *supra*, 165 Cal.App.4th at p. 1672.)

The evidence showed that the NF utilized different supply lines for their methamphetamine and marijuana sales operations. The prosecution proved that Frank

---

[10] In his briefing, Gonzalez emphasizes a four-factor test for deciding his claim, which was mentioned by a different panel of this court in *Vargas*, *supra*, 91 Cal.App.4th at p. 554. The four factors derive from *United States v. Zemek* (9th Cir.1980) 634 F.2d 1159. They are: "the nature of the scheme; the identity of the participants; the quality, frequency and duration of each conspirator's transactions; and the commonality of time and goals." (*Id*. at p. 1169.) In *Vargas*, this court applied the *Zemek* factors, upon defendant's suggestion, and ultimately rejected defendant's claim of multiple conspiracies. This court, however, noted that it had "not [been] pointed to any California case adopting the *Zemek* factors, nor ha[d] our own research disclosed such a case." (*Vargas*, at p. 554.) The same is true currently. For this reason, we do not apply the *Zemek* factors in this case. We instead rely on the relevant factors described in *Meneses*, *supra*, 165 Cal.App.4th at p. 1672.

Cruz (one of the gang members charged in counts 12 and 13) had five live marijuana plants growing outside his home and possessed 12 pounds of marijuana in his home when it was searched on October 30, 2014. Similarly, Gonzalez told Albert Lee that he (Gonzalez) had an outdoor grow operation and wanted Lee to sell some of that product. By contrast, according to Ulises Jimenez, the methamphetamine sold by the street regiment was not manufactured by the NF. Rather, the NF purchased their methamphetamine from Mexican cartels and other suppliers. Thus, the NF's sales operations were not wholly dependent on each other and one operation could remain successful despite a disruption in the other's supply line. Furthermore, a few witnesses testified about their own use of different drugs at different times, supporting the inference that not all drug purchasers would buy both marijuana and methamphetamine. Thus, there is evidence demonstrating a difference in the means by which the NF and its street regiment procured the marijuana and methamphetamine they sold and a difference in their target purchaser population. For these reasons, we conclude there is substantial evidence to support two separate conspiracy convictions on counts 12 and 13.

As we have decided that there is sufficient evidence to support both conspiracy convictions, but the evidence also could support a finding of a single conspiracy and thus the trial court failed to properly instruct the jury on counts 12 and 13, we conclude "the jury should have been directed to decide the factual issue that would have been posed by the omitted instruction" regarding the number of conspiracies. (*Jasso*, *supra*, 142 Cal.App.4th at p. 1223.)

Given these determinations, Gonzalez contends that we should reverse one of the two conspiracy convictions, namely, count 13 for conspiracy to sell marijuana. By contrast, the Attorney General requests that we provide the district attorney the option to either retry both counts or accept the jury's verdict on one of the two counts. Adhering to the approach of this court in *Jasso*, *supra*, 142 Cal.App.4th at page 1223, we agree with

21

the Attorney General and reverse the convictions on counts 12 and 13 and remand the matter with directions.

On remand, the district attorney shall have the option to either retry counts 12 and 13 or accept the jury's conviction and any true findings on attached allegations on one of those two counts, after which the other count and its attached allegations shall be dismissed.

In light of the vacatur of these convictions, we vacate Gonzalez's sentence entirely and direct the trial court to fully resentence Gonzalez upon the conclusion of any further proceedings. (See *People v. Navarro* (2007) 40 Cal.4th 668, 681 (*Navarro*).)

### 2. Attempted Criminal Threat

The trial court instructed the jury under CALCRIM No. 1300 on the criminal threat made to Vidal Santellano, charged in count 11. The jurors convicted Gonzalez on that count, finding a violation of section 422. On appeal, Gonzalez contends the trial court erred by failing to instruct the jury sua sponte on the lesser included offense of attempted criminal threat.

#### a. Factual Background

Cecilia Lozano and Gonzalez were close friends who had known each other since childhood. Gonzalez kept some things in a safe at Lozano's house. Lozano was married to but separated from Gabriel Zavala, who had been accused of molesting their children. Lozano learned from her friend, Ida Santellano, that Santellano's mother, Dorothy Ybarra (who had a relationship with Gabriel Zavala), possessed a letter accusing Lozano of storing Gonzalez's property at her house. Ybarra had plans to turn the letter over to Gabriel Zavala's lawyer to besmirch Lozano and get Zavala "off the hook" on the molestation case. Lozano told Gonzalez about the letter and said Gonzalez needed to get his things from her house. Gonzalez then removed the safe from Lozano's house. Both Lozano and Gonzalez were worried about the letter, and Gonzalez said that he was going to try to get it.

Ida Santellano's husband, Vidal Santellano, testified that in November 2013 Ida told him that Ybarra had gotten a letter about Lozano. Vidal Santellano was a former gang member. He contacted Lozano because he was concerned about "the kids" and told her that the letter would "most likely" be used against her. Later that night Vidal Santellano received a phone call about the letter from Lozano and a man who identified himself as Lozano's cousin. It was a "serious conversation" and the man "was saying it was important to get the letter back, pretty much." Santellano testified that he "wasn't, at any time, threatened at all" during the phone call.

Dorothy Ybarra testified that she obtained the letter about Lozano sometime in November 2013 and told Ida Santellano about it. Later that month, Ybarra's daughter, Crystal Martinez, told Ybarra that a couple of men had come to their home trying to get the letter. Martinez, Damien Zavala, their child, and a neighbor girl were in the home at the time the men entered. The men pushed the door in and chased Zavala into a bedroom. The men asked for Ybarra and then for the letter; they told Martinez that they were going to keep coming back until they got the letter. One of the men had a gun. On their way out of the home, the men stole Martinez's purse and a tablet computer (tablet).

Later, Ida Santellano told her husband Vidal about the home invasion, which he thought was "very serious" and scared him. That night, Vidal Santellano obtained the letter and took it to Lozano. Santellano admitted having told Detective Harper that he was " 'scared shitless' " and testified that he was fearful for "[n]ot that long. It was more of a shock type of thing to hear" about the home invasion. Santellano further testified that he feared retaliation for testifying because he knew that gangs retaliate against people who report crimes to police or testify.

Detective Harper testified that when he spoke to Vidal Santellano in December 2014, Santellano seemed to know who Gonzalez was and indicated he had been told of Gonzalez's name by Lozano. Santellano told Harper that the man on the phone "sounded threatening" but did not make any express threats. Santellano also said he knew "it was

23

serious" from the way the man spoke, and that the situation was "not a game." Santellano "took the conversation" to be "aggressive" and "intimidating." Santellano also assumed, based on his gang experience, that the people who wanted the letter were "beyond the street level."

At the time of gang member Ulises Jimenez's arrest in April 2014, police seized a kite written by Gonzalez about the home invasion (hereafter "the kite" or "Gonzalez's kite").[11] The kite was entered into evidence at trial. It said that Ybarra had had a letter regarding Gonzalez's storage of a safe containing drugs and money at Lozano's home, and Ybarra was going to provide the letter to her boyfriend's lawyer. The kite also detailed the actions Gonzalez and others had taken to obtain the letter. The kite stated: "I began to threaten [Vidal Santellano's] life and his family members[,] [s]pecifically [Dorothy Ybarra's,] if she so much as thinks to turn that letter in. I told [Santellano] before the night[']s over she will be a victim and that was entirely up to her depending on the decisions she makes. He said okay I'll get the letter back." The kite also documented that Gonzalez had gone to the home with two Norteños, Peter Avila ("Payaso") and Juan Garcia ("Monster"). Gonzalez recounted telling Martinez during the incident that he "was there to talk" and asking about Ybarra and the letter "she was going to give to the cops." Regarding Martinez's purse, Gonzalez wrote, "On the way out monster grabbed her [purse]. As soon as we got back to [the] car I said we didn't go there for that. Get rid of it."

### b. Legal Principles

Based on these facts, Gonzalez contends the trial court erred by failing to give a jury instruction on the lesser included offense of attempted criminal threat. "A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.'

---

[11] Detective Harper described a "kite" as a gang incident report or other written communication between gang members inscribed in micro-writing on strips of paper.

24

[Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403 (*Shockley*).) In reviewing the sufficiency of the evidence for this purpose, we resolve any doubts in defendant's favor and do not weigh the credibility of the witnesses. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

Section 422 (criminal threats) requires proof of the following elements: (1) the defendant willfully threatened to commit a crime that would result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that the statement be taken as a threat, even if he or she had no intent to actually carry it out; (3) the threat was, on its face and under the circumstances in which it was made, so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; (4) the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety; and (5) the threatened person's fear was reasonable under the circumstances. (§ 422; *People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*).)

The sustained fear element of section 422 refers to the victim's state of mind in response to the defendant's threat. (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349.) The element "has a subjective and an objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140.) The term " 'sustained' " "means a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

Attempted criminal threat is a lesser included offense of the crime of criminal threats under section 422. (*Toledo*, *supra*, 26 Cal.4th at p. 230.) "[A] defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent

25

to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action."  (*Ibid*.)

By way of example, our Supreme Court in *Toledo* explained that an attempted criminal threat would exist where a defendant "acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear."  (*Toledo*, *supra*, 26 Cal.4th at p. 231.) In this circumstance, "only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself."  (*Ibid*.)

We review independently whether the trial court improperly failed to instruct on a lesser included offense.  (*People v. Banks* (2014) 59 Cal.4th 1113, 1160, overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

In a noncapital case, a failure to instruct sua sponte on a lesser necessarily included offense that is supported by the evidence is state law error that we review for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).  (*People v. Breverman* (1998) 19 Cal.4th 142, 169 (*Breverman*).)  " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' "  (*People v. Beltran* (2013) 56 Cal.4th 935, 955 (*Beltran*).)  "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' "  (*Id*. at p. 956, italics omitted; see also *People v. Larsen* (2012) 205 Cal.App.4th 810, 831.)

26

c.  Analysis

Gonzalez asserts there is substantial evidence supporting his guilt of an attempted criminal threat but not a completed criminal threat.  He acknowledges that the kite documents his threat to Vidal Santellano's life and the life of his family and concedes there is "substantial evidence that Vidal was threatened."  But he claims that there is no substantial evidence that Santellano was "actually placed in sustained fear."  Gonzalez maintains that Santellano was not made afraid by the person he spoke to on the phone and "to the extent [Santellano] felt fear, it had nothing [to] do with the phone call."  Hence, according to Gonzalez, the jury could have concluded that his threat, "for whatever reason," did not cause Santellano "to subjectively be in sustained fear."  Thus, the jury would have convicted Gonzalez of only attempted criminal threat.  Gonzalez further contends that if the failure to instruct on attempted criminal threat is deemed state law error, he suffered prejudice because it is reasonably probable the jury would have found him guilty of attempted criminal threat if presented with that alternative.[12]

The Attorney General counters that the evidence did not support an inference that "Santellano was never in fear, nor . . . that his fear was not sustained."  The Attorney General further contends that any error in failing to instruct on attempted criminal threat was harmless under *Watson*.

We agree with Gonzalez that the trial court should have instructed the jury on the lesser included offense of attempted criminal threat.  Vidal Santellano testified that he was not expressly threatened during the phone call and did not feel threatened by the call—which he described as a "serious conversation" about obtaining the letter.  Moreover, Santellano testified that the fear he felt after the call was not based on the call

---

[12] Gonzalez also argues that the instructional error here violated his constitutional right to due process.  His argument, however, is foreclosed in this court by our Supreme Court's decision in *Breverman*, *supra*, 19 Cal.4th at page 169.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

itself. Rather, Santellano explained that his fear stemmed from the subsequent "very serious" home invasion incident—after which he proceeded to collect the letter and deliver it to Cecilia Lozano.

This evidence supports a conclusion that Santellano was not actually placed in sustained fear by Gonzalez's admitted threat during the phone call and the evidence is sufficient to have warranted an instruction on attempted criminal threat. (See *Shockley*, *supra*, 58 Cal.4th at pp. 403–404.) Given this evidence, and the lack of any direct evidence that Santellano was placed in sustained fear, we further conclude that Gonzalez has established there is a reasonable probability of a different outcome had the instruction been given. (See *Beltran*, *supra*, 56 Cal.4th at p. 955.)

However, we agree with the Attorney General that substantial evidence supports the conviction of the greater offense when the entire record is viewed in the light most favorable to the verdict. We know from the jury's verdict that the jurors credited Gonzalez's admission about threatening Santellano over Santellano's testimony and other statements that no express threat was uttered during the phone call. Furthermore, there was evidence upon which the jurors could reasonably conclude that Gonzalez's threats actually caused Santellano to be in sustained fear for his or his family's safety, despite his statements to the contrary. (See *People v. Davison* (1995) 32 Cal.App.4th 206, 214–215.)

The evidence supporting a finding that Santellano experienced actual (and reasonable) sustained fear as a result of the threatening phone call includes how Santellano acted after the call. (See *People v. Brugman* (2021) 62 Cal.App.5th 608, 634–635 [concluding that a victim's actions after the threatening incident supported a finding of sustained fear].) Gonzalez's kite states that after he made his threats to Santellano, Santellano said he would obtain the letter. Later, when Santellano received a call from his wife, he learned about the home invasion incident. Santellano testified that he was

28

scared after this, though "[n]ot [for] that long." He then went out, obtained the letter, and took it to Lozano.

In light of our conclusions that the court should have instructed on the lesser included offense and sufficient evidence supports the greater offense, we decide the appropriate remedy on remand is that the prosecutor must be given the option of retrying the greater offense, or accepting a reduction to the lesser offense. (*People v. Richards* (2017) 18 Cal.App.5th 549, 560–561.)

### 3. Witness or Victim Dissuasion

The trial court instructed the jury with modified versions of CALCRIM Nos. 2622 and 2623 on the offense of witness or victim dissuasion by force or threat of force or violence (§ 136.1, subd. (c)(1)), as charged in counts 7 and 8. The jurors convicted Gonzalez on those counts, relating to Damien Zavala and Crystal Martinez, respectively. On appeal, Gonzalez contends the trial court erred because it "effectively failed to instruct the jury on all of the elements of the offense of witness dissuasion."[13] We agree that the trial court erred but conclude that the error was harmless.

### a. Factual Background

As described above, there was substantial evidence presented at trial from which the jury could infer that Gonzalez learned that Ybarra possessed a letter indicating that Gonzalez was involved in illegal drugs. Ybarra planned to turn the letter over to a lawyer for use in an unrelated criminal case, presumably to use as a bargaining chip with the

---

[13] Trial counsel failed to object to or request modification of the trial court's instructions on witness or victim dissuasion. Gonzalez, however, raised a claim of instructional error in his motion for new trial, and the trial court summarily rejected it. On appeal, Gonzalez asserts that his claim is not forfeited because his substantial rights were affected by the court's instructions. (See § 1259.) Alternatively, he asserts that his trial counsel was ineffective for failing to object to the instructions. The Attorney General does not argue forfeiture. We conclude that Gonzalez's claim is properly raised in this appeal. (See *People v. Mil* (2012) 53 Cal.4th 400, 409; § 1259.) Because we decide Gonzalez's claim on the merits, we need not address his alternate ineffective assistance of counsel claim.

district attorney. Thereafter, three men (Gonzalez, Peter Avila, and Juan Garcia; one of whom was armed) entered Ybarra's house without permission, asked for the incriminating letter, and stole a purse and tablet. Crystal Martinez and Damien Zavala were in the home at the time, and the men specifically demanded the letter.[14]

### b. Legal Principles

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) That obligation includes instructing on all elements of a charged offense. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311, overruled on another ground in *People v. Merritt* (2017) 2 Cal.5th 819, 831 (*Merritt*).)

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574 (*O'Dell*).) "In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights. In making this determination we consider the specific language under challenge and, if necessary, the instructions as a whole." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585 (*Andrade*); see also *People v. Rivera* (2019) 7 Cal.5th 306, 329 (*Rivera*).) " ' "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

---

[14] Damien Zavala admitted to having friends who were affiliated with a gang and that he previously considered himself as "northern Hispanic" or a "Northerner." Zavala also admitted that he did not want to testify in this case and that calling the police or testifying about what happened would be considered snitching.

"When a court fails to instruct the jury on an element of an offense, the error violates the federal Constitution because a jury must find the defendant guilty of every element of the crime of conviction beyond a reasonable doubt." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 198–199 (*Gonzalez*); see *Neder v. United States* (1999) 527 U.S. 1, 8–15 (*Neder*).)  Accordingly, "[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Merritt*, *supra*, 2 Cal.5th at p. 831; see also *Neder*, at pp. 17, 19.)

Section 136.1, subdivision (c)(1) (hereafter section 136.1(c)(1)) provides that every person who knowingly and maliciously commits an act described in section 136.1, subdivision (a) or (b), where the act is accompanied by force or by an express or implied threat of force or violence, is guilty of a felony.[15]  Based on counts 7 and 8 of the indictment, the underlying acts required here, under section 136.1(c)(1), are those described by section 136.1, subdivision (b)(1) and (2).

Section 136.1, subdivision (b)(1) and (2) provide, in pertinent part:  "[E]very person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense . . .:  [¶]  (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge.  [¶]  (2) Causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof." (§ 136.1, subd. (b)(1), (2).)  Under section 136.1, subdivision (b), the "prosecution must [] establish that 'the defendant's acts or statements [were]

---

[15] Section 136.1, subdivision (c) states, in relevant part:  "Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances:  [¶]  (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person." (§ 136.1(c)(1).)

intended to affect or influence a potential witness's or victim's testimony or acts.'

[Citation.] In other words, 'section 136.1 is a specific intent crime.' " (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347; see also *People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.)

### c. Procedural Background

In this case, the jury instruction on section 136.1(c)(1)—provided through a modified version of CALCRIM No. 2623—stated, in full: "James Gonzalez is charged in Counts 7 and 8, with dissuading a witness or victim of a crime by use of force or threat of force [citation to section 136.1(c)(1)]. [¶] To prove the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant acted maliciously; [¶] AND [¶] 2. The defendant used force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness, a victim, or any other person; [¶] A person acts *maliciously* when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice."[16]

Following the modified CALCRIM No. 2623 instruction, the trial court instructed the jury on the firearm allegations attendant to counts 7 and 8 (among other counts) using CALCRIM No. 3115. (See § 12022, subds. (a)(1), (c).) Thereafter, the court instructed the jury on section 136.1, subdivision (b) with a modified version of CALCRIM No. 2622.[17] The court's instruction stated, in relevant part: "Dissuading or attempting to dissuade a witness or victim of a crime [citation to section 136.1, subdivisions (a) and (b)] is a lesser included offense to dissuading a witness or victim of a crime by use of force or threat of force, as charged in Counts 7 and 8, against James Gonzalez. [¶] To

---

[16] The written instruction was titled "2623. Intimidating a Witness: Sentencing Factors [¶] (Pen. Code, § 136.1(c))" (some capitalization omitted).
[17] This written instruction was titled "2622. Dissuading a Witness [¶] (Pen. Code, § 136.1(a) & (b))" (some capitalization omitted).

prove [the defendant] is guilty of this crime, the People must prove that: [¶] 1. The defendant maliciously tried to prevent or discourage, or prevented or discouraged Damien Zavala (Count 7) and/or Crystal Martinez (Count 8) from making a report that he or she and/or someone else was the victim of a crime to any state or local law enforcement officer, or prosecuting agency; [¶] 2. Damien Zavala and/or Crystal Martinez was a witness and/or crime victim; [¶] AND [¶] 3. The defendant knew he was trying to prevent Damien Zavala (Count 7) and/or Crystal Martinez (Count 8) from making a report that he or she and/or someone else was the victim of a crime to any state or local law enforcement officer, or prosecuting agency and intended to do so." The jury instruction also restated the definition of "*maliciously*" identically to that in the modified CALCRIM No. 2623 instruction. Further, as for who is a witness, the instruction under CALCRIM No. 2622 read, "*witness* means someone or a person the defendant reasonably believed to be someone: [¶] Who knows about the existence or nonexistence of facts relating to a crime."

The trial court did not instruct the jury regarding the additional charged act of dissuading a victim or witness from "[c]ausing" a charging instrument to be sought and prosecuted, and from assisting to prosecute that action. (§ 136.1, subd. (b)(2).) The court, however, did provide the jury a modified copy of the indictment (along with the jury instructions) that included language in counts 7 and 8 alleging this particular underlying act. Further, despite having provided this additional language to the jury in writing, the court did not read that language to the jury when it orally read the indictment during its instructions.

The prosecutor argued to the jury on counts 7 and 8 that Gonzalez "intimidated both Damien Zavala and Crystal Martinez" and "maliciously tried to discourage them from making a report [that] they were victims of crime to the police," namely about "the home invasion." The prosecutor also argued that the charged crimes were otherwise proved because Gonzalez "maliciously tried to discourage them from cooperating or

33

providing information that a criminal charge could be sought and prosecuted and from helping to prosecute that action." The prosecutor explained that the latter theory applied to the home invasion and "also to the drug dealing, [because Gonzalez was] discouraging them from turning over this letter or providing information that they know about his activities." In addition, the prosecutor described the definition of maliciously in accord with the jury instructions (i.e., that Gonzalez "intended to interfere with the orderly administration of justice") and argued that "Mr. Gonzalez knew what he was doing and he intended to do it, which, again, in this case, is not really at issue."

Gonzalez's trial counsel argued to the jury that the instructions provided for a greater crime involving the use of force or threat of force and a "lesser included" crime. Counsel maintained that there was no evidence from either Zavala or Martinez that "force or violence [was] used in any way to get them not to come forward if they believed that that was appropriate." As for the "lesser included crime," counsel similarly argued there was no evidence that Gonzalez tried to prevent Zavala or Martinez from making a report to authorities. Counsel noted Zavala's intoxication at the time of the home invasion and Martinez's memory problems, asserted based on the kite that "the perpetrator told [Martinez] that he was only there to talk," and maintained that the prosecutor had failed to meet his burden to prove guilt on either count 7 or 8.

The jury's verdicts on counts 7 and 8 stated that Gonzalez was guilty under section 136.1(c)(1), "in that . . . the defendant did knowingly and maliciously prevent or dissuade, or attempt to prevent or dissuade a witness or victim, [Zavala and Martinez], by use of force or threat of force."

d. Analysis

Gonzalez contends the modified CALCRIM No. 2623 instruction purported to comprise the elements for the charged crimes of dissuasion by force or threat under section 136.1(c)(1). Gonzalez argues that the instruction did not include the requisite elements for the underlying offense stated in section 136.1, subdivision (b)(1), namely

34

that Gonzalez intentionally tried to prevent Damien Zavala and Crystal Martinez from making a report. Gonzalez acknowledges that the instruction under CALCRIM No. 2622 included the elements that he contends were missing from the modified CALCRIM No. 2623 instruction. However, he notes that the CALCRIM No. 2622 instruction described itself as "a lesser included offense" of the greater crimes for which he was convicted (§ 136.1, subd. (c)(1)). He further asserts that nothing in the instructions told the jurors to "impute the elements listed in CALCRIM [No.] 2622 into CALCRIM [No.] 2623." In addition, Gonzalez points out that, as to the jury's deliberations on any lesser included offenses, the jurors were instructed that it was up to them " 'to decide the order' " in which they would " 'consider each crime and the relevant evidence,' " and the prosecutor argued that the jurors should " 'only consider lesser included offenses if [they] find that the charged offenses were not proven.' " Gonzalez finally contends the erroneous instruction on the charged dissuasion offenses was prejudicial under both *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) and *Watson*, *supra*, 46 Cal.2d at page 836.

The Attorney General counters that "there was no substantial likelihood that the jury misunderstood the required elements" of section 136.1(c)(1) and, under the *Chapman* test, "there is no reasonable possibility that this jury would have decided the case differently had it been instructed differently."

We agree with Gonzalez that the trial court's instructions on the charged violations of section 136.1(c)(1) are flawed in ways that make it reasonably likely the jurors understood the instructions in a manner violating Gonzalez's rights. Contrary to the CALCRIM pattern instruction, the trial court modified CALCRIM No. 2623 in a way that failed to require proof of the requisite elements of the underlying acts of dissuasion, i.e., those acts set forth in section 136.1, subdivision (b), which were necessary to find Gonzalez guilty of violating section 136.1(c)(1), i.e., that he had acted knowingly and maliciously when committing the underlying acts and did so with force or a threat of force or violence. (See § 136.1(c)(1).) The trial court's modified CALCRIM No. 2623

instruction did not mention any underlying act of dissuasion specifically. Rather it said the People had to prove that Gonzalez "acted maliciously" and further defined maliciously as including when one "intends to interfere in any way with the orderly administration of justice." This direction was insufficient because simply acting with an intent to interfere with the orderly administration of justice does not equate to acting with an intent to try and prevent Damien Zavala or Crystal Martinez from making a report of victimization, as the People were required to prove for counts 7 and 8.

It is true that the trial court's instruction under CALCRIM No. 2622 included as elements both the underlying act of dissuasion from making a report of victimization and the requirement that Gonzalez acted intentionally when attempting to prevent or dissuade Zavala and Martinez from making such a report. But that separate jury instruction was described as pertaining to "a lesser included offense" to the charged crime and the jury was not instructed on the legal definition of a lesser included offense. Further, there is an inconsistency in the instructions regarding exactly what underlying act or acts formed the basis of the charges in counts 7 and 8. As described above, the trial court gave the jurors a copy of the indictment that mentioned both the act of dissuasion from making a report of victimization and the act of dissuasion from causing a charging instrument to be sought and prosecuted. But the court did not include the latter act in its oral recitation of the indictment or in its instruction under CALCRIM No. 2622. Although the prosecutor mentioned in his closing argument the act of dissuasion from causing a charging instrument to be prosecuted, Gonzalez's trial counsel did not. Moreover, neither counsel addressed in argument the discrepancy between the indictment and the trial court's instruction under CALCRIM No. 2622. And neither counsel made it completely clear that the elements stated in the modified CALCRIM No. 2622 instruction had to be proved in order to find Gonzalez guilty under the modified CALCRIM No. 2623 instruction.

Given the imprecision and discrepancies in the trial court's instructions on the underlying acts for counts 7 and 8, the lack of definition on the legal doctrine of lesser

36

included offenses and possibility the jurors did not consider the lesser offense before considering the greater offense, and the lack of clear explanation in the parties' closing arguments regarding the requisite elements for the charged crimes, we decide there is a reasonable likelihood that the jurors did not understand they needed to impute the elements provided them in the CALCRIM No. 2622 instruction into the modified CALCRIM No. 2623 instruction in order to find Gonzalez guilty of violating section 136.1(c)(1).

Having concluded that the trial court erroneously failed to instruct the jury on the requisite elements of the charged dissuasion offenses, we must decide whether the error was harmless beyond a reasonable doubt. (See *Gonzalez*, *supra*, 5 Cal.5th at pp. 198–199.) "[A] *Chapman* harmless error analysis for instructional error typically includes review of the strength of the prosecution's case. [Citation.] Indeed, the harmless error inquiry for the erroneous omission of instruction on one or more elements of a crime focuses *primarily* on the weight of the evidence adduced at trial. Under *Neder*, . . . such an error is deemed harmless when a reviewing court, after conducting a thorough review of the record, 'concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' " (*People v. Aranda* (2012) 55 Cal.4th 342, 367; see also *Neder*, *supra*, 527 U.S. at pp. 17, 19.)

We are convinced that Gonzalez was not prejudiced by the trial court's instructional error. We acknowledge there is no evidence demonstrating that Gonzalez or his cohorts explicitly tried to prevent or discourage Zavala or Martinez from reporting the home invasion to law enforcement. However, " '[t]here is, of course, no talismanic requirement' " that a defendant explicitly state a warning to a victim or witness about not reporting victimization or a witnessed crime. (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.) There is no serious dispute that Gonzalez's actions (and those of his two cohorts) during the home invasion were forceful, intimidating, and fear-inducing. Gonzalez was motivated to get the incriminating letter (that he understood

revealed his storage of drugs and money) from Dorothy Ybarra before she could disclose it. Although Ybarra was not home at the time of the home invasion, Gonzalez menaced Martinez and Zavala with a gun and demanded the letter that he believed Ybarra was going to "give to the cops." As documented by Gonzalez's kite, Martinez admitted to knowing about the letter, and Gonzalez believed Zavala knew about it, too. Gonzalez also wrote that he and his cohorts "were very effective in the message [they] sent" during the home invasion.

The prosecution's evidence demonstrated that Gonzalez reasonably believed Martinez and Zavala knew about the incriminating letter and that Gonzalez tried to prevent or discourage them (along with Ybarra) from cooperating with law enforcement authorities or disclosing any information about the letter that could cause him to be prosecuted for his drug dealing. Moreover, as to the home invasion incident more generally, by making it clear that he did not want the letter to be disclosed, Gonzalez betrayed a further intention that he did not want Martinez and Zavala to report his and his cohort's criminal effort to get the letter by forcibly entering their home with a gun. Thus, there is overwhelming evidence here that Gonzalez acted during the home invasion with the concurrent intention to prevent or dissuade Martinez and Zavala from reporting his criminal victimization to law enforcement authorities and causing a prosecution of his drug dealing and crimes related to the home invasion. In addition, the evidence demonstrates that Gonzalez committed these acts while using force or a threat of force or violence on Martinez and Zavala.

Under these circumstances, we conclude, beyond a reasonable doubt, that the omitted elements for violation of section 136.1(c)(1) were uncontested and were supported by overwhelming evidence, such that the jury's verdicts on counts 7 and 8 would have been the same absent the instructional error. (See *Neder*, *supra*, 527 U.S. at p. 17.)

38

4. Street Terrorism Offense

The trial court instructed the jury with a version of CALCRIM No. 1400 on the offense of street terrorism (§ 186.22, subd. (a)), as charged in count 1 of the indictment. The instruction told the jurors that "felonious criminal conduct" under section 186.22, subdivision (a) meant the commission or attempted commission of murder, assault with a deadly weapon, identity theft, and/or possession of methamphetamine for sale. On appeal, Gonzalez contends his conviction for street terrorism should be reversed because the trial court erred by listing four felonies that did not qualify as felonious criminal conduct under section 186.22.[18] We agree that the trial court's instruction was erroneous and reverse the conviction on count 1.

a. Background and Legal Principles

In count 1, the indictment charged Gonzalez (and others, including codefendant Roman) with violating section 186.22, subdivision (a) (hereafter section 186.22(a)).[19]

---

[18] Trial counsel failed to object to or request modification of the trial court's instruction on street terrorism. Gonzalez, however, raised a similar claim of instructional error and a related claim of ineffective assistance of counsel in his reply to the district attorney's opposition to the motion for new trial. The trial court did not address Gonzalez's claims in its written ruling on the new trial motion. On appeal, Gonzalez asserts that his current claim is not forfeited because his substantial rights were affected by the court's instruction. (See § 1259.) Alternatively, he asserts that his trial counsel was ineffective for failing to object to the instruction. The Attorney General does not argue forfeiture in his respondent's brief. Under these circumstances, we will review Gonzalez's claim on the merits. (See *People v. Townsel* (2016) 63 Cal.4th 25, 59–60; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; *People v. Mitchell* (2008) 164 Cal.App.4th 442, 465; § 1259.) Because we decide Gonzalez's claim on its merits, we need not address Gonzalez's alternate ineffective assistance of counsel claim.

[19] At the time of the charged crimes, section 186.22, subdivision (a) (section 186.22(a)) provided: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." (See Stats. 2011, ch. 361, § 1.) The Legislature has not made any

Regarding "felonious criminal conduct," the indictment alleged "a violation of California Penal Code Section 182[, subd.] (a)(1) (conspiracy between defendant and others), in that on or about and between January 1, 2013 and October 30, 2014, . . . they did conspire together and with others to commit a crime, a violation of section [] 11379[, subd.] (a) of the Health & Safety Code of the State of California (selling methamphetamine); . . . a violation of section [ ] 11360[, subd.] (a) of the Health & Safety Code of the State of California (selling marijuana), and . . . a violation of section 4573 of the Penal Code of the State of California (bringing contraband into a custodial facility)" (some capitalization omitted).

"The elements of the gang participation offense in section 186.22(a) are:  First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).)  "[L]iability under this provision is limited 'to those who promote, further, or assist *a specific felony* committed by gang members and who know of the gang's pattern of criminal gang activity.' [Citation.]  In other words, the provision 'requir[es] the promotion or furtherance of *specific conduct* of gang members and not inchoate future conduct.' " (*People v. Valenzuela* (2019) 7 Cal.5th 415, 422.)  "Following the Supreme Court's decision in *Rodriguez*, a conviction for gang participation under section 186.22(a) requires the prosecution to prove the alleged gang member engaged in felonious conduct with another member of his or her gang." (*People v. Strike* (2020) 45 Cal.App.5th 143, 149–150.)

---

substantive changes to the wording of this provision since the period relevant to this case, i.e., January 1, 2013 through October 30, 2014.  (See Stats. 2011, ch. 361, § 1; Stats. 2013, ch. 508, § 1; Stats. 2016, ch. 887, § 1; Stats. 2017, ch. 561, § 178; Stats. 2021, ch. 699, §§ 3, 4.)

Regarding the felonious criminal conduct element of section 186.22(a), the trial court here instructed "the People must prove" "[t]he defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by: [¶] a. directly and actively committing a felony offense; [¶] OR [¶] b. aiding and abetting a felony offense. [¶] At least two members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang." The court also instructed that "[*f*]*elonious criminal conduct* means committing or attempting to commit the following crime: murder ([§§] 187, 664/187), assault with a deadly weapon ([§] 245), unlawful use of personal identifying information ([§] 530.5), and/or possession for sale of methamphetamine ([Health & Saf. Code, §] 11378)." The court referred the jurors to the separate instructions it provided for the listed offenses, in order for the jurors to decide whether a member of the gang committed any of those offenses.

Relatedly, in count 15, the indictment charged Gonzalez (alone) with a violation of Health and Safety Code section 11378, "in that on or about October 30, 2014, . . . he did possess methamphetamine, a controlled substance, for sale." The jurors found Gonzalez guilty on that count and found true the allegation that the quantity of methamphetamine exceeded one kilogram (Health & Saf. Code § 11370.4, subd. (b)).[20]

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof. [Citation.] We review the trial court's decision de novo. In so doing, we must determine whether there was indeed sufficient evidence to support the giving of a [particular] instruction. Stated differently, we must determine whether a reasonable trier of fact

---

[20] The indictment also charged Gonzalez with conspiring to sell methamphetamine on or about and between January 1, 2013, and October 30, 2014 (count 12).

could have found beyond a reasonable doubt that defendant committed" the charged offense based on the theory advanced. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

However, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) "[I]nstructions *not* supported by substantial evidence should not be given." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050.) "We consider the challenged instruction in the context of the instructions and record as a whole to ascertain whether there is a reasonable likelihood the jury impermissibly applied the instruction." (*Rivera*, *supra*, 7 Cal.5th at p. 329.)

When the jury has been instructed on " 'a *factually* inadequate theory,' or, also phrased slightly differently, cases in which there was an 'insufficiency of proof' " (*Guiton*, *supra*, 4 Cal.4th at p. 1128), reversal is not required "if at least one valid theory remains." (*Ibid*.) Put differently, "instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict." (*Id*. at p. 1130.) Thus, in cases where the inadequacy of a theory is factual, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Ibid*.; see also *People v. Canizales* (2019) 7 Cal.5th 591, 612–613.)

    b.  Analysis

Gonzalez contends the trial court erred by including in its instruction on count 1 the offenses of attempted murder (§§ 187, 664, subd. (a)) and assault with a deadly weapon (§ 245, subd. (a)(1))—crimes presumably relating to the stabbing of Curtis Garza—because those offenses were committed by him alone. He further asserts that the "same is true" for the possession of methamphetamine for sale offense (Health & Saf. Code § 11378), because "there was no evidence of any other gang members present at the

time" of his possession who were "in joint possession" of the methamphetamine he possessed. Regarding the identity theft offense (§ 530.5) listed in the trial court's instruction, Gonzalez claims he is unaware of any evidence showing that he was guilty of that offense and, even if his "possession of debit and identification cards could be construed as evidence of identity theft, there was no evidence that [he] committed this offense in conjunction with another person as required by *Rodriguez*." As to prejudice, Gonzalez contends that the erroneous inclusion of these four offenses as felonious criminal conduct amounts to a misdescription of an element under section 186.22(a) and implicates his Sixth Amendment right to have the jury determine every element of the charged offense. Hence, according to Gonzalez, the *Chapman* harmless error standard applies to his claim of error.

The Attorney General counters that Gonzalez's claim does not assert a legal error in the instruction. Rather, the Attorney General views the claim as one asserting that "there was no factual basis for finding the [listed] offenses." The Attorney General concedes that there was no evidence Gonzalez committed identity theft and no evidence proving that Gonzalez committed the attempted murder and assault with a deadly weapon with another gang member. However, the Attorney General argues there is substantial evidence Gonzalez "committed the methamphetamine-related offense in league with other gang members." The Attorney General asserts further that Gonzalez has not shown any prejudice, under *Watson*, from the trial court's instruction on the three factually unsupported theories of liability and one valid, factually supported theory.

We begin by stating our agreement with the parties that the trial court erred by including in its instruction the three predicate offenses of attempted murder, assault with a deadly weapon, and identity theft. As for the nature of the court's error, we concur with the Attorney General that the error is one of factual inadequacy for the felonious criminal conduct instruction, not one of a legal inadequacy. (See *Rivera*, *supra*, 7 Cal.5th at p. 329 ["A factually inadequate theory involves a mistake about a fact that the 'jury is

fully equipped to detect' [citation] or a theory that 'while legally correct, has no application to the facts of the case' "]; *People v. Aledamat* (2019) 8 Cal.5th 1, 7–8 (*Aledamat*).)  The trial court correctly instructed on the felonious criminal conduct element, generally, and listed predicate offenses that, on their face, could qualify as such conduct.  Thus, as to all four theories of liability for the felonious criminal conduct element, the court's instruction was not contrary to law or an incorrect statement of law.  Rather, the instructional error here occurred only because the evidence did not support all the theories provided for the jury's consideration.  (See *Guiton*, *supra*, 4 Cal.4th at p. 1129; cf. *People v. Lamas* (2007) 42 Cal.4th 516, 525–526.)

We turn next to the disputed issue regarding whether there was a sufficient factual basis for including the possession of methamphetamine for sale offense in the instruction on count 1.  Having considered the evidence and governing law, we agree with Gonzalez that there is no substantial evidence showing the offense was committed along with another gang member.[21]  As alluded to above, "[t]he plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1132.)  "[W]ith section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang-related." (*Id*. at p. 1138.)

Here, by contrast, the evidence showed that Gonzalez had a large quantity of methamphetamine in his residence when police searched it on October 30, 2014.  Although Gonzalez's brother was present at the time of the search, there was no evidence that the brother was a gang member or that any gang member had a connection to Gonzalez's residence.  Furthermore, there was no evidence supporting that a gang

---

[21] We note that Gonzalez does not make any separate claim challenging the sufficiency of the evidence for his conviction on count 1.  Rather, he frames his claim as one of instructional error.

member other than Gonzalez had some control or right to control the methamphetamine seized from Gonzalez's residence. Thus, no one else had constructive possession of the methamphetamine. (See *People v. Morante* (1999) 20 Cal.4th 403, 417; see also *People v. Rushing* (1989) 209 Cal.App.3d 618, 621–622.)

Moreover, although there was evidence that Gonzalez was part of the regiment and selling methamphetamine in October 2014, there was no evidence that Gonzalez involved another gang member in the acquisition of the methamphetamine he possessed in the residence that day. (See *People v. Johnson* (2014) 229 Cal.App.4th 910, 922.) In addition, there was evidence that gang members sometimes sold methamphetamine obtained from a source other than the gang.

Nevertheless, the Attorney General contends there was substantial evidence showing that Gonzalez possessed methamphetamine for sale "in complicity with numerous other gang members." In support of his argument, the Attorney General refers generally to the evidence of Gonzalez's deep involvement "in the primary activities of the gang, including the sale and possession for sale of methamphetamine." The Attorney General also points to the prosecutor's closing argument, which focused on Gonzalez's involvement in the conspiracy to sell methamphetamine with members of his gang. We acknowledge that there is ample evidence in the record of Gonzalez's active involvement in the gang's drug-sales activities. However, the felonious criminal conduct at issue in the trial court's instruction on count 1 was a possession of methamphetamine for sale offense, which in turn was based on the methamphetamine found in Gonzalez's residence on October 30, 2014. The listed predicate conduct was neither the sale of methamphetamine nor conspiracy to sell methamphetamine. Thus, the Attorney General's reliance on general evidence that the gang members acted together to sell methamphetamine is not persuasive to show that the listed predicate conduct of possession for sale was committed by at least two gang members.

45

Under the circumstances here, we conclude there was no substantial evidence showing that the possession of methamphetamine for sale offense listed in the instruction on count 1 was "felonious criminal conduct" under section 186.22(a).

Having concluded that none of the four offenses listed in the instruction was factually adequate to prove the requisite element, we decide that the trial court should not have included those offenses in its instruction. Because there was no factually adequate theory of liability presented to the jury for the felonious criminal conduct element under section 186.22, we must reverse Gonzalez's conviction on count 1. (See *Guiton*, *supra*, 4 Cal.4th at pp. 1128, 1130.)

Regarding the remedy for this error, the general rule is that where evidence is insufficient to support a jury's finding, retrial is barred. (See *Burks v. United States* (1978) 437 U.S. 1, 17–18; *People v. Seel* (2004) 34 Cal.4th 535, 550.) But if reversal is predicated on instructional error, then retrial is not barred. (See *People v. Hallock* (1989) 208 Cal.App.3d 595, 607.) As noted, Gonzalez has only raised a claim of instructional error, not a claim of insufficiency of the evidence, and he does not make any argument that he cannot be retried on count 1. Under these circumstances, we conclude the proper remedy in this circumstance is remand for retrial on count 1 if the district attorney so elects.

### 5. Gang Enhancements

Gonzalez contends post-trial legislative changes to section 186.22 require reversal of the jury's findings on the gang enhancement allegations for counts 5 and 6 (the counts based on Gonzalez's stabbing of Curtis Garza) and counts 7–11 (the counts related to the November 2013 home invasion) due to what amounts to instructional error.[22] The jury

---

[22] Although we have already decided to vacate Gonzalez's sentence entirely and reverse the conviction on count 11 for criminal threats (giving the prosecutor the option of retrying that offense or accepting a reduction to the lesser offense of attempted criminal threat), we will address the merits of Gonzalez's claim for the benefit of the trial court at Gonzalez's resentencing.

found true the allegations that Gonzalez committed the crimes of attempted murder (§§ 187, 664, subd. (a); count 5), assault with a deadly weapon (§ 245, subd. (a)(1); count 6), dissuading a witness or victim by force or threat (§ 136.1, subd. (c)(1); counts 7 & 8), robbery (§ 211; count 9), burglary (§ 460, subd. (a); count 10), and criminal threats (§ 422; count 11) "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1) & (4) (hereafter § 186.22(b)).[23]

With respect to the section 186.22(b) enhancements, the trial court instructed the jury that the prosecution must prove beyond a reasonable doubt that "1. The defendant committed or attempted to commit the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] and [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members" (some capitalization omitted).

In October 2021, while Gonzalez's appeal was pending in this court, the Governor approved Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), which amended section 186.22.[24] (Stats. 2021, ch. 699, §§ 3, 4.) Taking effect on January 1, 2022, section 186.22, as amended, includes a redrafted subdivision (g), which provides, "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or

---

[23] The jury also found true the gang enhancement allegations attached to counts 12, 13, 15, 16, and 17, but Gonzalez makes no argument challenging the validity of those findings under the recent changes to section 186.22.

[24] Assembly Bill 333 did not alter the relevant language of the section 186.22(b) enhancement itself, but it did, as explained *post*, alter the definition of terms in section 186.22(b).

informant." (§ 186.22, subd. (g) (hereafter § 186.22(g)), added by Stats. 2021, ch. 699, § 3.)

Prior to this amendment, section 186.22 had not defined the term "benefit" or the phrase "promote, further, or assist," as used in section 186.22(b), and courts had read the subdivision broadly. The California Supreme Court had underscored that the first prong of section 186.22(b) could encompass reputational effects: "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*People v. Albillar* (2010) 51 Cal.4th 47, 63.) Under the new subdivision (g) added by Assembly Bill 333, such evidence is no longer sufficient (or relevant) proof of the benefit element of section 186.22(b).

### a. Retroactivity of Assembly Bill 333

Gonzalez contends that the new section 186.22(g) enacted by Assembly Bill 333 applies to his case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) as an ameliorative statute that creates the potential for lesser punishment.[25] The *Estrada* rule, which applies to enhancements as well as substantive offenses, "rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 881 (*Buycks*).)

We agree with Gonzalez that the text of Assembly Bill 333 does not demonstrate any clear legislative intent that the statute should not apply retroactively. We further agree that the *Estrada* presumption applies because, by narrowing the scope of benefit

---

[25] As Assembly Bill 333 has gone into effect, we need not address Gonzalez's contention that the applicability of section 186.22(g) is ripe for our review.

element of section 186.22(b)(1), Assembly Bill 333 reduces the possibility the enhancement will apply. (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 344; see also *People v. Vinson* (2011) 193 Cal.App.4th 1190, 1197.) As Gonzalez's conviction is not yet final on appeal, he is entitled to the benefit of the new section 186.22(g). (*Lopez*, at p. 344.)

### b. Prejudice

Unsurprisingly (because section 186.22(g) had not then been enacted), the trial court did not include in the jury instructions for the gang enhancement the subdivision's directive that the prosecution must prove beyond a reasonable doubt that the common benefit to the gang was "more than reputational." In light of our conclusion that section 186.22(g) applies retroactively here, this omission amounts to error, and we must decide its effect. With respect to the appropriate analytical framework, Gonzalez suggests that it either constitutes structural error, requiring automatic reversal, or is subject to the *Chapman*, *supra*, 386 U.S. 18, standard of harmlessness beyond a reasonable doubt.

We reject Gonzalez's contention of structural error, because there is no contention that the instructional omission was so severe that it amounted to "the total deprivation of a jury trial." (*Merritt*, *supra*, 2 Cal.5th at p. 830, italics omitted.) Indeed, Gonzalez does not contend that the jury was misinstructed on any aspect of section 186.22(b) other than failure to include the new language drawn from section 186.22(g).

When the trial court fails to instruct a jury on an element of an offense, "[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Merritt*, *supra*, 2 Cal.5th at p. 831.) Similarly, under "alternative-theory error" (where the jury is properly instructed both on a legally valid theory and on an erroneous one), a "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a

reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) As the prejudice standard is the same, we need not resolve the precise nature of the error here.

As to counts 5 and 6, Gonzalez asserts this court cannot conclude the error was harmless beyond a reasonable doubt because it is "likely" the jury concluded that the benefit the Norteños received by Gonzalez stabbing Garza was reputational. Gonzalez cites Detective Harper's testimony that the stabbing would send a message and an arguably similar statement by the prosecutor in closing argument. Gonzalez acknowledges that section 186.22(g) includes " 'financial gain or motivation' " in its definition of " 'common benefit' " for the gang but asserts that Gonzalez did not stab Garza to steal money from him because Garza had no money. Instead, in Gonzalez's view, the direct benefit to the gang flowing from the stabbing was enhancement of the gang's reputation for violence.

Regarding counts 7–11, Gonzalez again cites Detective Harper's testimony about the reputational nature of the benefit to the gang stemming from the home invasion incident. Gonzalez acknowledges that he and his gang "served to gain by retrieving the incriminating letter," which was a "specific and tangible benefit in addition to the more general reputational benefit."

To determine whether the erroneous instruction requires reversal of the true findings on the gang enhancement, we examine "all relevant circumstances" (*Aledamat*, *supra*, 8 Cal.5th at p. 13) and in particular the evidence and arguments heard by the jury. (*Id*. at p. 15.)

### i. Trial Testimony and Closing Arguments

Curtis Garza testified that he sold methamphetamine obtained from Gonzalez, who would "front" the drugs to Garza. Prior to the stabbing, Garza had obtained drugs from Gonzalez three to five times. Leading up to the stabbing, Gonzalez had supplied Garza methamphetamine on credit, and Garza owed him $300 to $500. Gonzalez approached Garza, and Gonzalez asked for his money. Garza told him he did not have it. Gonzalez

looked around and began stabbing Garza. Garza did not testify that Gonzalez said anything to him prior to or during the stabbing other than the request for money.

At the time of the stabbing, Garza believed Gonzalez to be a Norteño. Garza thought Gonzalez "had status" in the gang and was of a higher status in the gang than Garza. Garza himself was not paying taxes or monetary dues to any gang. Garza was addicted to methamphetamine during the period in which he bought drugs from Gonzalez.

Testifying as a gang expert, Detective Harper gave the following testimony about the benefit to the gang of Gonzalez's stabbing of Garza, "if you're a drug dealer and a Norte[ñ]o and striving to advance within the gang, and you allow people to take advantage of you, not pay their debts, disrespect you, that's not going to be looked upon very well within the gang leadership and gang community."[26] The prosecutor asked, "Does it also benefit the NF to have it known on the street that they do not tolerate people not paying their debts?" Harper responded, "Absolutely, as well as the acts of violence to basically show that it's not going to be tolerated. They exert control over people, including their own membership, through fear of violent acts and retaliation for not falling in line."

With respect to the gang enhancement allegations for counts 5 and 6, the prosecutor contended in closing argument, "it benefits the gang when people are in fear of members of the NF or Norte[ñ]os, when people know basically not to mess with them, and they know that they need to pay their drug debts. So we've heard a lot about how the NF relies on fear. They basically have to be a fear organization to maintain their control of the streets. [¶] And it was intended to assist, further, or promote criminal conduct by gang members, in that criminal conduct is the drug-trafficking conspiracy. Basically, you

---

[26] According to Detective Harper, Gonzalez was not part of the "regiment" at the time of the stabbing.

cannot have a drug-trafficking conspiracy if people who are drug addicts don't pay their drug debts."

Regarding the home invasion incident (the facts of which are detailed *ante* (see section II.B.2.a.)), Detective Harper testified that the incident could benefit the gang by demonstrating its desire for "some level of respect and authority" and opposition to "let[ting] people take advantage of you and subject your criminal activities to law enforcement detection and prosecution." Harper also testified that the incident was committed with the intent to promote criminal conduct by gang members because unless a gang member "can control [his] surroundings and basically show people that cooperation and snitching isn't tolerated, it's going to weaken the gang's position."

In the same vein, the prosecutor argued to the jury that the incident benefited the gang by "stop[ping] witnesses from cooperating with law enforcement" and getting "word . . . out on the street that if you try to mess with the NF or you try to go to the cops, they'll bust into your home with a gun, put a pillowcase over your head, [and] threaten your life in front of your child." Further, the prosecutor maintained that there was an intent to assist, further, or promote criminal conduct by gang members because the crimes were committed "to maintain control over the streets."

Gonzalez's trial counsel argued in closing argument that there was insufficient evidence of the gang allegations because the crimes alleged in counts 5 and 6 occurred prior to Gonzalez's joining the regiment and "before he had any gang activity." Gonzalez's trial counsel also argued generally that there was insufficient evidence to establish that the stabbing and home invasion incident "were done to benefit, aid, assist criminal street gangs" because the crimes were committed before Gonzalez met Jimenez or was "closely associated with the street gang."

ii. Analysis

Having reviewed the record, we conclude that the failure to include the limitation added by section 186.22(g) was not harmless beyond a reasonable doubt. Although there

52

was substantial evidence that the stabbing of Garza involved a "financial . . . motivation" (§ 186.22(g)) and that the home invasion incident was committed for the purposes of "intimidation or silencing of a potential current or previous witness or informant" (*id*.), Detective Harper's testimony and the prosecutor's argument to the jurors regarding the enhancement allegations underscored the reputational benefit that would flow to the gang from commission of the underlying crimes.

The Attorney General argues that, on this record, a rational jury instructed under new section 186.22(g) would have returned the same verdict, i.e., finding that the stabbing and home invasion-related crimes were not merely reputational. We acknowledge that the evidence related to the gang enhancements went beyond reputation, in that debt collection and the suppression of cooperation and enforcement were noted by Detective Harper. However, the primary focus of Detective Harper's testimony and the prosecutor's argument was on the general reputation of the gang as it related to the crimes. Regarding the Garza stabbing, Harper and the prosecutor emphasized how a failure to collect a debt would be "looked upon" poorly by the "gang community" and how the gang benefits "when people know basically not to mess with" the gang. Similarly, regarding the home invasion, Harper talked about the "gang's position" in the community, and the prosecutor argued about the gang getting the word "out on the street" that cooperation with police will be met with violence. Under the stringent test for error we must apply, we cannot determine "that the error did not contribute to the verdict" (*Aledamat*, *supra*, 8 Cal.5th at p. 12) or that it is "clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Merritt*, *supra*, 2 Cal.5th at p. 831.) This case is like *People v. E.H.* (2022) 75 Cal.App.5th 467 (*E.H.*), where another Court of Appeal found prejudice even though there was testimony at trial about financial benefits to the gang that were not merely reputational. (*Id*. at pp. 479–480.)

Accordingly, we decide the instructional error regarding the section 186.22(b) sentence enhancement allegations attached to counts 5–11 was not harmless. We therefore reverse the true findings on the gang enhancement allegations on counts 5–11.

Given our conclusion that there was prejudicial error, when resentencing Gonzalez on remand, the trial court cannot—absent a retrial on the allegations—impose enhanced sentences on counts 5–11 based on the jury's findings on the attendant section 186.22(b) allegations. However, our conclusion does not bar the district attorney from retrying Gonzalez on the gang enhancement allegations in counts 5–11, should he choose to do so. (See *E.H.*, *supra*, 75 Cal.App.5th at p. 480; *People v. Sek* (2022) 74 Cal.App.5th 657, 669–670.)

Having reviewed all of Gonzalez's claims of instructional error, we now turn to his assertions that insufficient evidence supports his conviction for robbery.[27]

C. *Sufficiency of Evidence of Robbery*

Gonzalez contends there was insufficient evidence for his second degree robbery conviction on count 9, which relates to the November 2013 home invasion committed by Gonzalez and two other gang members, the evidence of which we have recounted above in our discussion of the criminal threat instruction (see section II.B.2.a.).

Gonzalez argues the evidence does not support that the taking of Crystal Martinez's purse by Juan Garcia was "a natural and probable consequence of the object of the conspiracy" between himself, Garcia, and Peter Avila to obtain the incriminating

---

[27] Gonzalez also contends there was insufficient evidence, as a matter of law, to show the existence of more than one conspiracy. As explained above (section II.B.1.c.), we have determined that the conspiracy convictions on counts 12 and 13 must be vacated for instructional error, but those counts were supported by substantial evidence and are subject to retrial. Having already rejected Gonzalez's insufficiency claim, we do not address it further.

letter from Dorothy Ybarra. Gonzalez further asserts that "the evidence was insufficient to show a causal connection between the taking of the purse and Crystal Martinez's fear."

### 1. Background and Legal Principles

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Powell*, *supra*, 5 Cal.5th at p. 944; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; *People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.) "In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Ibid*.) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid*.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The final element " 'is cast in the alternative; it may be accomplished either by force *or* by fear.' " (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 611 (*Montalvo*).)

" '[T]he "force" required for robbery is not necessarily synonymous with a physical corporeal assault.' [Citation.] However, '[t]he law does require that the perpetrator exert some quantum of force in excess of that "necessary to accomplish the mere seizing of the property." ' [Citation.] '[T]he force need not be great.' [Citation.] 'An accepted articulation of the rule is that "[a]ll the force that is required to make the

55

offense a robbery is such force as is actually sufficient to overcome the victim's resistance." ' " (*Montalvo*, *supra*, 36 Cal.App.5th at p. 618.)

The fear element "may be either:  [¶]  1. The fear of an unlawful injury to the person or property of the person robbed, or of any relative of his or member of his family; or,  [¶]  2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery."  (§ 212.)  " 'To establish a robbery was committed by means of fear, the prosecution "must present evidence 'that the victim was *in fact afraid*, and that such fear allowed the crime to be accomplished.' " ' [Citation.]  Thus, the fear element is subjective in nature.  [Citation.] However, the victim need not explicitly testify that he or she was afraid of injury where there is evidence from which it can be inferred that the victim was in fact afraid of injury. [Citation.]  'The fear is sufficient if it facilitated the defendant's taking of the property. Thus, any intimidation, even without threats, may be sufficient.' [Citation.]  However, given the language of section 212, the intimidation must not only produce fear, but the fear must be of the infliction of injury." (*Montalvo*, *supra*, 36 Cal.App.5th at p. 612.)

Here, the indictment charged Gonzalez, Peter Avila, and Juan Garcia with robbery for taking a purse from Martinez.  The jury instructions and prosecutor's arguments addressed Gonzalez's liability for robbery based on the natural and probable consequences doctrine as applied to the acts of coconspirators.  Specifically, the jury was instructed with CALCRIM No. 417 that "the People must prove that:  [¶]  1. [Gonzalez] conspired to commit burglary;  [¶]  2. A member of the conspiracy committed robbery to further the conspiracy;  [¶]  AND  [¶]  3. Robbery was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit." (See *In re Hardy* (2007) 41 Cal.4th 977, 1025–1026; *People v. Guillen* (2014) 227 Cal.App.4th 934, 998 (*Guillen*).)  The jury was further instructed that "[a] natural and probable consequence is one that a reasonable person would know is likely to happen

if nothing unusual intervenes" (italics omitted).  (See *People v. Prettyman* (1996) 14 Cal.4th 248, 291 (conc. & dis. opn. of Brown, J.).)

Under the natural and probable consequences doctrine, " 'the ultimate factual question is one of foreseeability.'  [Citation.]  Thus, ' "[a] natural and probable consequence is a foreseeable consequence". . . .'  [Citation.]  But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . ."  [Citation.]'  [Citation.]  A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

2.  Analysis

Applying the foregoing principles to the facts of this case, we reject Gonzalez's challenge to the evidence supporting a robbery.  Gonzalez rightly asserts that "the object of the conspiracy was clear – to retrieve the incriminating letter."  However, we are not convinced it was unforeseeable that one of Gonzalez's coconspirators "would break rank and steal something when that was not the purpose of the mission."

Based on the facts presented to Gonzalez's jury, and by contrast to the circumstances in *People v. Leon* (2008) 161 Cal.App.4th 149, 159–161, there is a close connection between the target crime (i.e., burglary to steal the incriminating letter and dissuade a witness from disclosing information about the actions of gang members) and the taking of other items from the victims during this intimidating home invasion. Gonzalez, Juan Garcia, and Peter Avila forcibly entered Ybarra's and Martinez's home armed with a gun that they put to the head of Damien Zavala.  Detective Harper testified that a primary activity of the Norteños is robbery.  There also was evidence presented about Norteño gang members routinely violating laws and not abiding by their gang's dictates—causing the gang to bring them "in line."  That one of Gonzalez's gang-member coconspirators would avail himself of the opportunity created by this home invasion to

57

take some other property—including a purse—against an occupant's will by means of force or fear is reasonably foreseeable when judged objectively in this case.

Furthermore, in his kite about this crime, Gonzalez recounted telling Martinez that they were "going to keep coming back till [Ybarra] gives [] up" the letter. Gonzalez also wrote that he and his cohorts "were very effective in the message [they] sent." In this context, Juan Garcia's taking of the purse at the tail end of a bid to get the letter reinforced the coconspirators' message that they would not be deterred from getting what they wanted from Ybarra and her family. In addition, that Gonzalez (after the crime) told Garcia that they did not go to the house to get the purse and he should get rid of it is only marginally germane to the foreseeability issue because the foreseeability test is an objective one, not subjective. (*Guillen*, *supra*, 227 Cal.App.4th at p. 998.) Moreover, the jurors could have reasonably deduced from Gonzalez's statement that he wanted to avoid being caught with evidence of a robbery, not that he was surprised by Garcia's taking. This is especially so given that Gonzalez admitted to compensating Garcia for his assistance in the crime despite his theft of the purse. For these reasons, we conclude there is substantial evidence upon which the jurors could find, beyond a reasonable doubt, that a reasonable person would know one of the coconspirators on this gang "mission" to acquire the incriminating letter would take other property in furtherance of the conspiracy.

Similarly, we are not persuaded by Gonzalez that there was insufficient evidence for the jurors to find that the purse was taken by means of force or fear. Although Martinez testified that she could not recall the home invasion, soon after the incident Martinez reported to her mother (Ybarra) and sister (Ida Santellano) that the men pushed their way into the home, chased Damien Zavala into a bedroom, demanded the letter, had

58

a gun, pointed it at Martinez, and stole her purse and the tablet on the way out.[28] Similarly, Damien Zavala testified that Martinez was emotional and crying immediately after the incident and told him that she saw a gun and the men took her purse and their daughter's tablet.

Gonzalez asserts that "[t]here certainly was no evidence that the purse was taken by *force*." He acknowledges the evidence that one of the men pointed a gun at Martinez, but maintains that occurred "upon entry into the house, not when the purse was taken as they were leaving." Based on our review of the trial testimony, it is not clear that the gun-pointing, in fact, occurred when the men first entered the home. Furthermore, Gonzalez wrote the following about the gun in his kite: "For the record there was only 1 firearm used in the room to contain Damien Zavala." Gonzalez also wrote that he then directed Martinez to enter the room, demanded the letter, and told Martinez they were going to keep coming back until Ybarra gave them the letter. "Then we [(the intruders)] left. On the way out [Garcia] grabbed her purse." In light of this evidence, Gonzalez's contention that there was no support for a taking by force is contrary to precedent defining that element of robbery.

Robbery is a continuing offense. "All the elements must be satisfied before the crime is completed. However, . . . no artificial parsing is required as to the precise moment or order in which the elements are satisfied." (*People v. Gomez* (2008) 43 Cal.4th 249, 254, fn. omitted.) Furthermore, although " 'the act of force or intimidation by which the taking is accomplished in robbery must be motivated by the intent to steal' " (*People v. Anderson* (2011) 51 Cal.4th 989, 994), " '[t]he elements of force and fear do

---

[28] Martinez testified that she did not remember "any of that day." She explained that she was in a "bad car accident about five years ago and . . . do[es]n't remember a lot of stuff." Martinez also testified that she did not want to be at the trial. In addition, before trial, Martinez refused to speak to Detective Harper. The district attorney presented testimony from other witnesses about statements Martinez had made to them about the home invasion.

not need to be extreme for purposes of constituting robbery. [Citations.] [¶] This means that the threat of bodily harm can frequently exceed the minimum requirement necessary for purposes of establishing robbery.' " (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1776.) Here, the jurors could reasonably conclude from the evidence that the threat posed by the gun and other intimidating acts committed during the home invasion amounted to a use of force by the intruders to, at minimum, prevent Martinez from resisting the taking of the purse as they left. (See *People v. Flynn* (2000) 77 Cal.App.4th 766, 771 (*Flynn*) [taking by force or fear includes " 'simply deterring a victim from preventing the theft or attempting to immediately reclaim the property' "].)

Similarly, the victim's fear "need not be the result of an express threat" (*Flynn*, *supra*, 77 Cal.App.4th at p. 771), and "[r]esistance by the victim is not a required element of robbery." (*People v. Morehead* (2011) 191 Cal.App.4th 765, 775.) "Intimidation of the victim equates with fear," and "[i]f there is evidence from which fear may be inferred, the victim need not explicitly testify that he or she was afraid." (*Ibid.*) Here, the jurors heard evidence about Martinez crying and being highly emotional after the home invasion. This testimony, when viewed in the context of the other evidence about the incident, provides substantial evidence from which the jurors could reasonably infer that Martinez feared injury to herself or the others in the home or their property, and her fear facilitated Garcia's taking of the purse on his way out. Moreover, the jurors could have reasonably deduced from the evidence that the property—which was located inside the home with Martinez—was taken from her immediate presence. (See *People v. Hayes* (1990) 52 Cal.3d 577, 627.)

"If the record demonstrates adequate evidence from which the jury might have inferred the existence of either force or fear, the appellate court must affirm." (*People v. James* (1963) 218 Cal.App.2d 166, 170.) Viewing the trial evidence in the light most favorable to the conviction, we conclude there is sufficient evidence from which a

reasonable juror could find beyond a reasonable doubt that Gonzalez was guilty of robbery as charged in count 9.

D. *Bifurcation of Gang Enhancement Allegations*

Assembly Bill 333 did not only amend section 186.22 (see section II.B.5., *ante*). It also added section 1109, which provides that, upon request of the defendant, a gang enhancement allegation under section 186.22 shall be tried after the defendant's guilt on the underlying offense has been determined.[29] (Stats. 2021, ch. 699, § 5, eff. Jan. 1, 2022.)

Gonzalez contends that section 1109 applies retroactively to his nonfinal judgment. He asserts further that the failure to bifurcate the gang enhancement allegations from the substantive offenses for which he was convicted is structural error and, thus, all the counts that were accompanied by a gang enhancement allegation (i.e., counts 5–13 and 15–17) must be reversed.[30] To support his arguments, Gonzalez relies principally on the recent decision of a different panel of this court in *People v. Burgos*

---

[29] Section 1109 provides: "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of [s]ection 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of [s]ection 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence. [¶] (b) If a defendant is charged with a violation of subdivision (a) of [s]ection 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of [s]ection 186.22." (§ 1109, subds. (a), (b).)

[30] Gonzalez makes no argument regarding the potential applicability of section 1109, subdivision (b), to his conviction on count 1 for street terrorism (§ 186.22, subd. (a))—a count that we reverse based on instructional error unrelated to Assembly Bill 333 (see section II.B.4., *ante*).

(2021) 77 Cal.App.5th 550 (*Burgos*). In addition, Gonzalez argues that even if the error here is not structural, at least his convictions and the attached gang enhancements on counts 5 through 10 should be reversed because the error implicated his constitutional right to due process and was not harmless under *Chapman* or *Watson*.

The Attorney General counters that: (1) Gonzalez forfeited his current claim by failing to request bifurcation at trial; (2) the majority opinion in *Burgos* incorrectly applied the rule of *Estrada*, *supra*, 63 Cal.2d 740, and section 1109 is not retroactive; and (3) contrary to the majority's suggestion in *Burgos*, *supra*, 77 Cal.App.5th at page 568, structural error principles are inapposite to section 1109 and any error for lack of bifurcation here is harmless under the appropriate error standard, i.e., *Watson*, *supra*, 46 Cal.2d 818.

    1. <u>Analysis</u>

Assembly Bill 333 does not expressly address whether section 1109 was intended to apply retroactively or only prospectively. (See Stats. 2021, ch. 699.) The majority in *Burgos*, however, concluded that section 1109 applies retroactively. (*Burgos*, *supra*, 77 Cal.App.5th at p. 568; see also *People v. Ramos* (Apr. 27, 2022, F080916) ___Cal.App.5th___ [2022 Cal.App. LEXIS 355, 26] (*Ramos*).) The dissent disagreed with the majority's conclusion regarding retroactivity (*Burgos*, at p. 575 (dis. opn. of Elia, J.)), and another Court of Appeal recently decided that section 1109 does not apply retroactively. (*People v. Perez* (May 2, 2022, B300396) ___Cal.App.5th___ [2022 Cal.App. LEXIS 374, 28].)

We need not decide here whether section 1109 operates retroactively, or whether Gonzalez forfeited his claim of error by failing to request bifurcation at trial, because even assuming retroactive application and no forfeiture, the failure to bifurcate in this case is harmless error.

Our Supreme Court recently summarized the concepts of harmless and structural error: " 'When the error is one of state law only, it generally does not warrant reversal

62

unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]' [Citation.] Federal constitutional errors require reversal unless the beneficiary of the error can show it was 'harmless beyond a reasonable doubt.' [Citation.] [¶] But not all errors are amenable to harmless error analysis. We have, 'in a number of contexts, [found] that certain errors, by their nature, result in a "miscarriage of justice" within the meaning of the California harmless-error provision requiring reversal without regard to the strength of the evidence received at trial.' . . . [¶] The same is true under federal law. In holding that some errors of a constitutional dimension are amenable to harmless error analysis, the court in *Chapman* also recognized that 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' " (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1073; see also Cal. Const., art. VI, § 13; *People v. Cahill* (1993) 5 Cal.4th 478, 493; *McCoy v. Louisiana* (2018) 584 U.S. ___ [200 L.Ed.2d 821, 833, 138 S.Ct. 1500, 1511] (*McCoy*) ["Structural error 'affect[s] the framework within which the trial proceeds,' as distinguished from a lapse or flaw that is 'simply an error in the trial process itself.' "].)

Although the *Burgos* majority stated that a failure to bifurcate under section 1109 "likely constitutes 'structural error' because it 'def[ies] analysis by harmless-error standards' " (*Burgos, supra,* 77 Cal.App.5th at p. 568), it did not so hold. Instead, the majority assumed an assessment of prejudice was required and ultimately concluded that the defendants there suffered prejudice under either *Watson* or the more rigorous *Chapman* standard. (*Id*. at pp. 568–569.)

Considering the principles of harmless and structural error, we are not persuaded that a failure to bifurcate under section 1109, if error, is unamenable to harmless error review. The admission of evidence on gang enhancement allegations in an unbifurcated proceeding does not affect the framework of the trial (see *McCoy, supra,* 584 U.S. at p. ___ [138 S.Ct. at p. 1511] [listing errors deemed structural]), and the effect of such

63

admission on the outcome of a trial can be quantitatively assessed. (See *E.H.*, *supra*, 75 Cal.App.5th at p. 480 [applying *Watson* harmless error analysis to section 1109]; *Ramos*, *supra*, ___Cal.App.5th at p. ___ [2022 Cal.App. LEXIS 355, 27–30] [same]; see also *People v. Pinholster* (1992) 1 Cal.4th 865, 931–932 [applying *Watson* to a failure to sever a count], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Burch* (2007) 148 Cal.App.4th 862, 868–869 [applying *Watson* to a failure to bifurcate trial on a prior conviction].)

Moreover, we are not convinced that the *Chapman* harmless error standard applies under the circumstances of this case. As explained further below, much of the gang evidence presented at trial was relevant to the substantive offenses and not particularly inflammatory. Thus, we cannot conclude that the failure to bifurcate the gang enhancement allegations from the substantive offenses violated Gonzalez's federal constitutional due process rights by rendering his trial fundamentally unfair. (See *Ramos*, *supra*, ___Cal.App.5th at p. ___ , fn. 7 [2022 Cal.App. LEXIS 355, 27]; cf. *People v. Albarran* (2007) 149 Cal.App.4th 214, 228–232.)

Instead, we conclude that the failure to bifurcate trial on the gang enhancement allegations, if error, amounts in this case to state law error subject to the *Watson* standard. (See *E.H.*, *supra*, 75 Cal.App.5th at p. 480; *Ramos*, *supra*, ___Cal.App.5th at pp. ___ [2022 Cal.App. LEXIS 355, at 27–30].) Under that standard, Gonzalez fails to demonstrate that it is reasonably probable he would have obtained a more favorable result on the substantive offenses charged in counts 5 through 10 had they been bifurcated from the gang enhancement allegations.

The evidence supporting Gonzalez's convictions on those counts—as described throughout this opinion—was considerable. For the convictions of attempted murder (count 5) and assault with a deadly weapon (count 6), Curtis Garza convincingly identified Gonzalez as his attacker, and the serious nature of the stabbing was supported by medical records. Further, the prosecution presented overwhelming evidence of

Gonzalez's actions related to the November 2013 home invasion (including his kite), supporting his convictions for witness or victim dissuasion on Damien Zavala and Crystal Martinez (counts 7 & 8), robbery (count 9), and burglary (count 10). All told, the prosecution presented strong evidence that Gonzalez was guilty of the substantive offenses in counts 5 through 10 regardless of the gang evidence.

Furthermore, "nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, ___Cal.App.5th at p. ___ [2022 Cal.App. LEXIS 355, 28].) Here, Gonzalez's gang connection was relevant to contested issues related to several of the substantive offenses, including Gonzalez's motive. Thus, it is likely much of the evidence concerning Gonzalez's gang membership and activities would have been admitted at a bifurcated trial on those offenses. (See *id*. at pp. ___ , [28–29].) Moreover, other gang evidence that might not have been admitted had the trial been bifurcated was not so inflammatory that it likely biased the jurors against Gonzalez on the question of guilt.[31] Additionally, the trial court provided a limiting instruction to the jurors regarding their consideration of the gang evidence.

For these reasons, we conclude—even assuming that section 1109 applies to him and he did not forfeit the issue by failing to request bifurcation—that Gonzalez was not prejudiced by the failure to bifurcate the gang enhancement allegations from his trial on the underlying substantive offenses.

E. *Motion for New Trial*

Gonzalez raises several claims on appeal with respect to the trial court's denial of his motion for new trial. Gonzalez contends that the trial court erred by denying the

---

[31] The gang evidence that might have been excluded from a separate trial on the underlying offenses includes evidence of Gonzalez's attack on fellow gang member Arlindo Silva, the general structure and activities of the NF/Norteños and its membership, and the predicate offenses of attempted murder and assault with a deadly weapon related to an August 2013 attack by two Norteños on a fellow gang member in the county jail.

motion for new trial on three grounds: (1) ineffective assistance of counsel for failing to impeach Curtis Garza; (2) witness misconduct by Detective Harper and related ineffective assistance of counsel; and (3) ineffective assistance of counsel for failing to object or otherwise remedy the prosecutor's misstatement of law in closing argument. For the reasons explained below, we reject Gonzalez's claims of error related to the motion for new trial.

### 1. Impeachment of Curtis Garza

Gonzalez contends the trial court erred by denying his motion for new trial on count 5 (attempted murder) and count 6 (assault with a deadly weapon) because his trial counsel was ineffective for failing to impeach Curtis Garza with prior statements that he did not owe Gonzalez money for a drug debt when Gonzalez stabbed him.

### a. Background

Garza testified that Gonzalez had provided him methamphetamine on credit a handful of times in the weeks prior to the stabbing. Before the stabbing happened, Garza owed Gonzalez about $300 to $500 for drugs Gonzalez had provided and Garza had missed an appointment to pay Gonzalez. On the day of their missed appointment, Gonzalez spotted Garza, approached him, and asked for the money. Garza told Gonzalez he did not have the money because he had been robbed. Gonzalez then suddenly stabbed Garza. On cross-examination of Garza, Gonzalez's trial counsel (Koller) did not ask Garza anything about a prior statement to the police about the stabbing.

In his closing argument on counts 5 and 6, the prosecutor contended that Gonzalez acted with an intent to kill because he had "a motive" to kill Garza, "in that [Gonzalez] was mad about the drug debt that Mr. Garza owed him. He went and found [Garza]. He went to his neighborhood." The prosecutor argued further that Gonzalez did not just try to "send a message" or "just . . . scar" Garza. Rather, Gonzalez stabbed Garza in the chest, close to his heart, "trying to kill him." Regarding the gang enhancement allegations attendant to counts 5 and 6 (§ 186.22, subd. (b)(1)(C)), the prosecutor argued

66

that the NF/Norteños benefitted from Gonzalez's crimes because the gang instills fear and maintains control by letting people know "they need to pay their drug debts" and "not to mess with" the gang.  In addition, the prosecutor asserted that the crimes were intended to promote, further, or assist the gang's "drug-trafficking conspiracy," because such conspiracy cannot exist if "drug addicts don't pay their drug debts."

Gonzalez's trial counsel (Koller) argued to the jury that Garza was an unreliable witness, there was insufficient proof of Gonzalez's identity as Garza's assailant or that the assailant had an intent to kill, and, in any event, the stabbing happened before Gonzalez became a member of the gang's street regiment.

During their deliberations, the jurors requested a transcript of Garza's testimony and the "testimony of Det. Harper related to the alleged stabbing of Curtis Garza by James Gonzalez or any statements or interviews with Det. Harper by Curtis Garza."  No prior police interview of Garza had been admitted or used at trial.[32]

Prior to trial, (on January 5, 2015) Detective Harper and another detective had interviewed Garza.  At the time, Garza had been in jail for a month on a "45 day [probation] violation."  Garza told the detectives that Gonzalez was an ex-boyfriend of Garza's girlfriend (Alexis Grijalva), to whom Garza had recently become engaged. Garza first met and spoke to Gonzalez about two years earlier (in 2012).  Garza told Gonzalez that he (Garza) was "from Southside San Jose, Sick-Minded" Norteños, even though Garza had "disbanded from them [] like the year before that" and was "chillin' [in a] different hood."  Gonzalez told Garza that he (Gonzalez) was "slinging dope" (i.e., methamphetamine) and gave Garza his phone number.  Gonzalez did not tell Garza that he (Gonzalez) "had status" in the Norteños at that time.

---

[32] After the jury returned its verdicts, Gonzalez filed a motion for new trial that included a transcript of a pretrial police interview of Garza.  The trial court admitted the interview into evidence at a hearing on the new trial motion.

After they first met, Garza received drugs from Gonzalez about five to seven times under an arrangement in which Garza paid Gonzalez up front for one-half of the drugs provided, with the other half provided on credit which Garza would pay off when Gonzalez provided the next batch of drugs. The amounts provided by Gonzalez during an approximately two-week period before the stabbing occurred quickly increased from a quarter ounce, to a half ounce, and to a full ounce (which cost $600). This made Garza nervous, and Gonzalez did not ask Garza about taking larger amounts of methamphetamine.

Garza told the detectives that the stabbing occurred about two or three weeks after he first met Gonzalez.[33] Regarding the stabbing, Garza gave the following account to the detectives, which forms the basis of Gonzalez's ineffective assistance of counsel claim: "Um, the night before I was supposed to pick - actually the - I was supposed to pay him on - on, uh, I forget. I mean it was – it's been a minute too like after that. But during that - that three day period it was just like I got - I can barely remember I - it like - from - to the day after the hospital. Um, it was, uh, we kind of got - he got mad 'cause like, uh, I - I gave - I gave him 600 bucks right, for the zip [(i.e., a batch of drugs)]. [¶] [Detective Harper says, "Mm-hm."] [¶] And, you know, obviously I expected another zip right? And he was like: 'Well I don't - I don't have a zi- I don't have a zip right now.' Um, 'cause he was chillin' with some broad right? [¶] [Detective Harper says, "Mmm."] [¶] And so I was like, 'All right well how about check this out. I have my boy go down there and - and give you 300,' and he said - and I - and I told him, or I, you know, 'Will you bring that other zip? I'll shoot you 300,' 'cause at that - that was - that was - that was the verbal contract. Was, you know, half - half and half. You know? Do half and shoot me

---

[33] In the interview, Garza said the stabbing happened in February 2012. At trial, Garza testified that he was stabbed and taken to the hospital on January 11, 2014. However, other trial evidence (including testimony from a responding police officer) demonstrates that Garza was in fact stabbed on January 11, 2013.

the other half. You know? And so I - I kept on 300 bucks. He said, 'All right.' He said, 'All right,' you know, 'I'll see you tomorrow.' " They then agreed to meet the next day at 12:30.

Garza slept that night at a drug user's house (after having been "awake for like six days straight"). Someone stole Garza's phone, three grams of "dope," and the $300 he had. Garza overslept and missed his scheduled meeting with Gonzalez. Garza later walked around the neighborhood trying to find Gonzalez. Gonzalez spotted Garza, exited his car, approached Garza, and they had a short conversation during which Garza apparently told Gonzalez "I ain't tryin' to jack you homie." Gonzalez did not make eye contact with Garza and suddenly stabbed him. No one was with Gonzalez when he stabbed Garza, but Garza thought two guys were in the area at the time (although they had walked away).

Garza told the detectives that he did not talk to police after the stabbing because he did not know whom he could trust; the incident made him paranoid.

b. Gonzalez's Motion for New Trial

In a new trial motion (motion), Gonzalez, through newly appointed counsel (Upton), asserted multiple grounds challenging his convictions on counts 5 and 6, including ineffective assistance of counsel because trial counsel (Koller) "was unaware of the prior inconsistent statements by Garza regarding whether he owed a drug debt to Gonzalez at the time of the stabbing" in January 2013 (some capitalization omitted).**[34]**

---

**[34]** Gonzalez also alleged Koller was ineffective for "not presenting a defense of self-defense," as requested by Gonzalez. In a declaration filed in support of his motion, Gonzalez declared, among other things: "I stabbed Curtis Garza on January 11, 2013."; "When I stabbed Curtis Garza on January 11, 2013, Garza did not owe me any money."; and "When I stabbed [] Curtis Garza on January 11, 2013, I acted in self-defense." In his motion, Gonzalez alleged that he admitted the stabbing to Koller and told Koller it was done in self-defense. Regarding the failure to present a defense of self-defense, Gonzalez maintained that "[t]here is no tactical reason why [his] counsel failed to use Garza's tape-recorded statements to impeach Garza at trial" (some capitalization omitted). Gonzalez does not raise any claim regarding self-defense in this appeal.

Gonzalez argued further that evidence demonstrating Garza "did not owe a drug debt to Gonzalez on the day of the stabbing would have been devastating to the People's theory for the motive for the stabbing" and "would also have impeached Detective Harper."

The district attorney opposed Gonzalez's motion. Gonzalez filed a reply to the opposition, reiterating his claim of ineffective assistance of counsel for failing to impeach Garza and Detective Harper with what Gonzalez characterized as Garza's prior inconsistent statements. Gonzalez argued that the prejudice from trial counsel's failure "was obvious" because Garza and Harper "fabricate[d] a motive for the stabbing." Gonzalez also asserted that Garza's "entire interview is exculpatory" and its admission into evidence "would have illuminated" Harper's false testimony.

At a hearing on the motion, Upton called Koller as a witness. Koller acknowledged that his strategy to defend against the Garza stabbing included that Garza was an unreliable witness, there was a lack of corroboration regarding Gonzalez being the assailant, and Garza had failed to report the stabbing to the Norteño gang. Koller testified that, prior to trial, he had reviewed all discovery, the prior testimony of witnesses, and the interviews of witnesses and victims, including Garza's January 5, 2015 interview.

When asked to explain why he rejected self-defense in favor of a defense that Garza was an unreliable witness, Koller said that "in reviewing Garza's transcript, it appears he's all over the map with regard to things that had happened. My concern was in pursuing certain avenues, I would open up doors that would hurt us in other areas. For example, the gang aspect, because as it stood, there wasn't as much evidence . . . presented at trial as what [Garza] talks about within the transcript. And so I was trying to show also that this was not gang-related." Further, when asked if Garza's changing story would be considered a prior inconsistent statement, Koller acknowledged that it would but reiterated that he "didn't really want to get into the transcript aspect of things, because it opened up a lot of other doors and avenues for [Garza] to say things

70

that could be harmful." In addition, Koller testified that Garza's prior statement about his interaction with Gonzalez leading up to the stabbing evinced Garza's confusion and, thus, Koller did not "know if [Garza] met with [Gonzalez] the day before" the stabbing.

In a written decision, the trial court denied Gonzalez's motion for new trial as to counts 5 and 6 and the attendant sentence enhancements. Regarding Gonzalez's argument that there was no support for the prosecutor's theory that the stabbing was committed to collect a drug debt, the court found that "Garza's [interview] statement was not clear. As Koller testified, Garza's statement was confusing and he was not sure regarding when he'd met with [Gonzalez], though current counsel asserts that it was clearly the day before the stabbing. Also, contrary to [Gonzalez]'s assertion that no drug debt existed, Garza's testimony at trial was that he did owe money to [Gonzalez] for drugs. At best, Koller could only have attempted to impeach Garza's testimony with the prior statement. Koller was concerned that such questioning could have led to Garza being questioned on other areas, including gang activity by [Gonzalez], which Koller stated would have been detrimental to [Gonzalez]'s interests. The court finds that Koller's decision not to cross examine Garza on this issue to be reasonable and not IAC" (ineffective assistance of counsel).

c. Standard of Review and Other Legal Principles

The parties disagree on the standard we should use to review the trial court's denial of Gonzalez's new-trial motion claim of ineffective assistance of counsel (IAC). Gonzalez urges us to follow a "two-step process" set forth by a sister Court of Appeal in *People v. Taylor* (1984) 162 Cal.App.3d 720 (*Taylor*). Under that approach, we defer to any express or implied factual finding supported by substantial evidence and accept that "all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences." (*Id*. at p. 724.) From there, we exercise our independent judgment to

71

measure the facts as found by the trial court against the constitutional standard for IAC claims. (*Id.* at p. 725.)

By contrast, the Attorney General asks us to use the abuse of discretion standard when reviewing Gonzalez's IAC-based claim. The California Supreme Court recently applied that standard in *People v. Hoyt* (2020) 8 Cal.5th 892 (*Hoyt*). There, our Supreme Court reviewed a trial court's denial of a new trial motion that included IAC claims. (*Id.* at p. 957.) The court stated, " ' " ' "We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] " 'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.' " ' " ' " (*Ibid.*) In *Hoyt*, our Supreme Court did not mention *Taylor* when describing its standard of review or deciding the defendant's challenge to the denial of his IAC claims. (See *id.* at pp. 957–962.)

In the present case, each party contends he should prevail regardless of the standard of review we choose to apply. Under these circumstances, we will apply *Taylor*'s two-step, mixed standard of review to Gonzalez's IAC-based new-trial motion claim (rather than the abuse of discretion standard), without deciding whether our Supreme Court in *Hoyt* overruled, sub silentio, the standard set forth in *Taylor*.

Although IAC claims are "[u]sually . . . 'more appropriately decided in a habeas corpus proceeding[,]' . . . a defendant may raise the issue of counsel's effectiveness as a basis for a new trial, and, to expedite justice, a trial court should rule '[i]f the court is able to determine the effectiveness issue on such motion.' [Citation.] To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*Hoyt*, *supra*,

72

8 Cal.5th at p. 958; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) We can reject an IAC claim if the defendant fails to establish either element of the *Strickland* standard. (See *Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"[T]o what extent and how to cross-examine witnesses" are among "the wide range of tactical decisions competent counsel must make." (*People v. Cleveland* (2004) 32 Cal.4th 704, 746 (*Cleveland*).) " 'As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation.' " (*People v. Williams* (1997) 16 Cal.4th 153, 217 (*Williams*).) A " 'trial counsel's tactical decisions are accorded substantial deference' " and " '[a] reviewing court will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185 (*Riel*); *Strickland*, *supra*, 466 U.S. at pp. 689–690.) When the reason for counsel's actions appears in the record, "the court will determine whether that reason reflects reasonably competent performance by an attorney acting as a conscientious and diligent advocate." (*People v. Coddington* (2000) 23 Cal.4th 529, 652 (*Coddington*), overruled on another ground by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

d. Analysis

We reject Gonzalez's contention that Koller's failure to cross-examine Garza with his prior statements regarding the state of his drug dealings with Gonzalez before the stabbing amounted to deficient performance. To be sure, Garza testified (and the district attorney argued) that Garza owed Gonzalez about $300 to $500 for methamphetamine that Gonzalez had provided, and Garza intended to meet with Gonzalez to pay him money. We also acknowledge that if Koller had cross-examined Garza about his statements on the state of the drug transactions, that examination would not necessarily have opened the door to other statements made by Garza that were irrelevant to

rehabilitation on the contested point. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 802–803, abrogated on other grounds by *Rangel*, *supra*, 62 Cal.4th at p. 1216.)

Nevertheless, we agree with Koller's and the trial court's assessment that Garza's prior statements were "confusing" and "all over the map." Garza claimed in the police interview that he could "barely remember" the days surrounding the stabbing and he did not clearly state when he gave Gonzalez "600 bucks . . . for the zip." Garza also did not make clear exactly what the $600 covered. Was it a full payment for an ounce of methamphetamine previously provided completely on credit? Or did the $600 comprise a $300 credit payment for one-half of a previously provided batch of drugs, and a $300 upfront payment for one-half of the next batch of drugs, under their "pay half now, half later" arrangement? After stating that he "gave" Gonzalez "600 bucks," Garza made more opaque statements about expecting "another zip" (which Gonzalez could not then provide) and proposing to have his unidentified "boy" meet with Gonzalez and give him $300. But it is not clear from Garza's statement whether this delivery occurred. Garza also proposed "shoot[ing]" Gonzalez $300 as half payment for more drugs and further said that he (Garza) "kept on 300 bucks." Again, the meaning of this statement is not clear.

We do not agree with Gonzalez that Garza's prior statements show that he did not owe Gonzalez any money for previously provided methamphetamine at the time of the stabbing. Thus, Garza's prior statements about the circumstances leading up to the stabbing were not clearly inconsistent with Garza's trial testimony about owing some $300 to $500 to Gonzalez. Regardless of whether Koller unreasonably harbored concerns about opening the door to other potentially harmful information, there is a significant lack of clarity in Garza's prior statements. Given the opacity of Garza's statements, we conclude that Koller acted within an objective standard of reasonableness for a conscientious and diligent advocate when he declined to impeach Garza with his

74

prior statements to police about the state of his drug dealings with Gonzalez leading up to the stabbing.

Because Gonzalez has failed to demonstrate that Koller's performance was deficient with regard to Garza's prior statements, we reject Gonzalez's claim that the trial court erred in denying his motion for new trial on that IAC ground for counts 5 and 6.

### 2. Detective Harper's Testimony

Gonzalez contends the trial court erred by denying his motion for new trial on counts 5 and 6 "because the jury never should have heard from [Detective] Harper that Garza told him that he was warned not to mess with [Gonzalez] because he was a member of the NF." According to Gonzalez, "[Detective] Harper was at fault for injecting inadmissible information into his answer that was not responsive to defense counsel's question" (i.e., "witness misconduct") and "counsel was also at fault for even asking the question in the first place and then in failing to correct the misleading nature of [Detective] Harper's response" (i.e., IAC).

### a. Background

Detective Harper testified on direct examination that he did not believe Gonzalez was a member of Ulises Jimenez's street regiment at the time of the Garza stabbing (in January 2013), but Gonzalez was then a Norteño gang member. Detective Harper also said that, in his expert opinion, the stabbing benefited Gonzalez and the gang because it demonstrated that disrespect or a failure to pay debts to the gang would not be tolerated and the gang used fear of violence and retaliation against people who did not "fall[] in line." On cross-examination, Koller asked if Detective Harper knew "whether Mr. Gonzalez was actually selling regimental dope" at the time of the stabbing. Detective Harper answered, "I do not. I know that Mr. Garza was warned not to mess with Mr.

75

Gonzalez or his money for that reason."[35] Koller then asked, "Because it's regimental dope?" And Detective Harper answered, "Because he was working with the NF." Thereafter, Koller posed additional questions that prompted Detective Harper to confirm his understanding that, even after the subsequent home invasion (in November 2013), Gonzalez was not "part of" or "a member of" the street regiment.

During his January 2015 police interview, Garza stated that his fiancée's sister Risa had told him not to " 'fuck with' " Gonzalez's money because Gonzalez presumably was getting it from others. Risa, however, did not specifically say that Gonzalez's source was the "Regiment." Garza also said that Gonzalez "wasn't pickin' it up" from "Southsiders" or "paisas"—presumably meaning that Garza believed Gonzalez was getting his money and supply of methamphetamine from the Norteño gang. Gonzalez never told Garza that he (Gonzalez) "was working with the Regiment."

In his motion for new trial, Gonzalez asserted that Koller was ineffective for failing to object to Detective Harper's "false" responses to Koller's cross-examination questions and that Detective Harper's answers amounted to "*People v. Sanchez* [(2016) 63 Cal.4th 665] error," in that they were non-responsive, violated a prior in limine ruling, were hearsay, and violated Gonzalez's right to confrontation.[36] In his reply to the prosecution's opposition to the motion, Gonzalez further faulted the prosecutor for not moving to strike Detective Harper's false answers.

---

[35] Koller's entire question posed to Detective Harper read: "Now, during one of the hypotheticals, you were asked about the stabbing of Mr. Garza, and one of the hypotheses -- or one of the facts that was given to you was that if a person is selling regimental dope. Do you know, at that time, whether Mr. Gonzalez was actually selling regimental dope?" We are not aware of any hypothetical question in the record that asked Harper to assume a person was selling regimental dope at the time of a stabbing.

[36] Gonzalez moved in limine for the prosecution to admonish its witnesses to "make no statements that would be inadmissible" (capitalization and bolding omitted). The trial court apparently granted Gonzalez's in limine request to the extent that "[a]ll parties are required to advise their witnesses of the Court's in limine rulings."

At the hearing on the new trial motion, Koller confirmed that his "defense theory" was that Gonzalez "had no relationship with the NF, that [Gonzalez], if anything, was freelancing selling drugs," and that there was no evidence "Gonzalez ever paid the NF any taxes or any contributions, and at the very best, he was an inactive Norte[ñ]o, who may or may not have been selling drugs." Koller did not otherwise provide any specific testimony on the reason he had asked Detective Harper the specific questions at issue in this claim.

Additionally, Gonzalez's new counsel Upton argued variously at the hearing that Gonzalez was prejudiced by Detective Harper's improper, false responses to Koller's questions and that, if Koller had been aware of related information in Garza's interview and Detective Harper's police report, Koller would not have asked the initial question about regimental dope or, alternatively, would have objected to Detective Harper's response or attempted to impeach him.

During the hearing, the trial court noted its view that, "at least for argument's sake," Detective Harper's initial answer "perhaps[] implied" that Gonzalez "was selling regimental dope." However, the court explained that Koller specifically followed up on the issue of regimental dope and Detective Harper clarified that he knew Garza had been warned not to mess with Gonzalez " '[b]ecause he was working with the NF.' "

In its written denial of Gonzalez's motion, the trial court found Gonzalez's claims regarding Detective Harper's testimony about Garza's statements "not persuasive." The court concluded there was sufficient evidence that Garza's identification of Gonzalez "as the stabber was credible" and "to support a finding the stabbing was gang related." Further, the court explained that there was evidence to support that Gonzalez "was working with the NF and that Garza had been warned not to deal with [Gonzalez] because [he] was with NF."

77

b. Standard of Review and Other Legal Principles

As discussed, *ante*, we review the trial court's denial of a new trial motion alleging an IAC claim using *Taylor*'s mixed standard of review. (*Taylor*, *supra*, 162 Cal.App.3d at pp. 724–725.) For other alleged claims, "a trial court's ruling on a motion for new trial is subject to review for abuse of discretion." (*People v. Clair* (1992) 2 Cal.4th 629, 667.)

Regarding a claim of "witness misconduct," our Supreme Court has stated that, "[a]lthough most cases involve prosecutorial or juror misconduct as the basis for [a mistrial] motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." (*People v. Wharton* (1991) 53 Cal.3d 522, 565 (*Wharton*).) " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*Ibid*.)

Regarding IAC claims, a failure to object generally "is a matter of trial tactics as to which we will not exercise judicial hindsight." (*People v. Kelly* (1992) 1 Cal.4th 495, 520.) The same is true for challenges to a trial counsel's questions on cross-examination. (See *Cleveland*, *supra*, 32 Cal.4th at p. 746; *Williams*, *supra*, 16 Cal.4th at p. 217.) There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689.) "If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 876, overruled on other grounds by *People v. Hardy* (2018) 5 Cal.5th 56, 104; see also *Hoyt*, *supra*, 8 Cal.5th at pp. 958–960.)

c. Analysis

Gonzalez asserts that Detective Harper's answer to Koller's yes-or-no question about whether Detective Harper knew Gonzalez was selling regimental dope amounted to

witness misconduct because the answer was non-responsive and provided inadmissible hearsay to prove that Gonzalez "had ties to the regiment or, at least, the NF."[37] In addition, Gonzalez contends that Koller performed deficiently because he misremembered Detective Harper's direct examination and failed to correct the misimpression "that Garza was given a warning that expressly linked [Gonzalez] to the [NF] gang." Gonzalez claims that Koller could have "alleviated the prejudice stemming from [Detective] Harper's answer by clarifying that Garza was, in fact, not told that [Gonzalez] was working with the NF." For this reason, according to Gonzalez, it was reasonably probable that, given the otherwise limited evidence of Gonzalez's Norteño membership status in January 2013, the jury's verdicts on counts 5 and 6 and the attendant gang enhancements would have been different if Koller had pursued the alleged clarification.

We are not persuaded by Gonzalez's arguments. As to his claim of witness misconduct, Gonzalez relies on precedent that is inapposite for two reasons. First, Gonzalez cites California Supreme Court cases addressing alleged witness misconduct that was contemporaneously challenged by defendants at trial through mistrial motions. (See, e.g., *Wharton*, *supra*, 53 Cal.3d at pp. 564–566; *People v. Harris* (2013) 57 Cal.4th 804, 847–849; *People v. Dement* (2011) 53 Cal.4th 1, 37–40, abrogated on other grounds by *Rangel*, *supra*, 62 Cal.4th at p. 1216; *Williams*, *supra*, 16 Cal.4th at pp. 211–212; but see *People v. Schiers* (1971) 19 Cal.App.3d 102, 112.) Here, by contrast, Gonzalez did not move for a mistrial (or even object) after Detective Harper provided his answers. Gonzalez makes no argument why the witness misconduct protections addressed by our Supreme Court in the cited cases should extend to a case like his, in which no objection

---

[37] We note that the Attorney General makes no argument that Gonzalez's witness misconduct claim is not properly preserved for appellate review because it was not raised in the trial court. Because the Attorney General does not assert forfeiture, we will assume arguendo that forfeiture is inapplicable here and address the merits of Gonzalez's claim.

or mistrial motion was made at the time of the alleged misconduct. Second, and more importantly, Gonzalez fails to provide any convincing reason why Detective Harper's testimony was so prejudicial that the harm it caused could not have been cured by a contemporaneous admonition or instruction to the jury. Given the lack of a motion for mistrial and the inadequate showing of incurable prejudice flowing from Detective Harper's answers, we conclude that the trial court did not abuse its discretion when it denied Gonzalez's new-trial motion claim of witness misconduct.

Turning to Gonzalez's IAC claim, at the hearing on the new trial motion, Koller was not asked why he cross-examined Detective Harper the way he did. In the absence of an explanation from Koller, we discern a plausible reason for Koller's initial question, his failure to object to Detective Harper's answer, and his follow-up questions. Namely, Koller may have been trying to show that Gonzalez was not connected to the regiment at the time of the stabbing—despite the fact that Detective Harper had testified Gonzalez was then a Norteño gang member. Koller's actions in this regard were consistent with his overall strategy to show that there was little evidence of Gonzalez's direct involvement with the NF/Norteños gang or the regiment until a later point in 2014. Accordingly, we must reject Gonzalez's IAC claim. (See *Williams*, *supra*, 16 Cal.4th at pp. 217–218.)

Even assuming for the sake of argument that Koller performed deficiently when he cross-examined Detective Harper, and further assuming that Detective Harper committed misconduct when he volunteered knowing that Garza had been warned not to mess with Gonzalez or his money because he was either "selling regimental dope" or (as clarified) "working with the NF," we are not convinced that Detective Harper's testimony prejudiced Gonzalez. This portion of Detective Harper's testimony was brief and unaccompanied by any basis for Detective Harper's knowledge of the warning Garza had received. Further, we agree with the trial court that Garza's testimony credibly established that Gonzalez was the stabber and there was other evidence (beyond Detective Harper's challenged testimony) to support that Gonzalez was an active Norteño

gang member at the time of the stabbing. On this record, we conclude there is no reasonable probability that the outcome of the trial on counts 5 and 6 and the attendant gang enhancements would have been different absent the challenged testimony. We further conclude that there is no reasonable probability of a different result if Koller had questioned Detective Harper further using Garza's interview statements that Risa did not tell him Gonzalez was working with the regiment or that Garza surmised Gonzalez was getting his money and methamphetamine from the Norteño gang.

Accordingly, we reject Gonzalez's claim that the trial court erred in denying his motion for new trial as to counts 5 and 6 on the grounds of witness misconduct or ineffective assistance of counsel.

### 3. Prosecutor's Alleged Misstatement of Law on Lesser Included Offenses

Gonzalez contends the trial court erred by denying his motion for new trial because his trial counsel was ineffective for failing to object to or otherwise clarify the prosecutor's alleged misstatement of law regarding how the jurors should consider the lesser included offenses.

#### a. Background

The trial court instructed the jurors on several lesser included offenses, including for counts 6 through 9, and 15. The court also instructed the jurors with CALCRIM No. 3517, which listed the offenses/counts covered by the instruction and told the jurors, inter alia: "It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime."

Near the end of his closing argument, the prosecutor addressed the issue of lesser included offenses. He told the jurors that the prosecution had proven all of the counts and allegations against both Gonzalez and his codefendant Roman and said the following about the lesser included offenses: "I'm going to make it simple for you and tell you don't consider the lesser included offenses, because what I'm going to ask you to do is to

81

follow the evidence. If you follow the evidence, there is enough evidence to convict of the charged offenses. And the judge explained to you, you only consider lesser included offenses if you find that the charged offenses were not proven. [¶] So if you determine there's enough evidence to convict of the charged offenses in the indictment, you don't even need to consider the lesser included offenses." Additionally, using assault with a deadly weapon (count 6) as an example, the prosecutor explained that if the jurors found the greater offense proven, they "move on" and "don't get to [the] lesser included of simple assault. [¶] Now, if you look at it and you say it was not proven, that's the only time you need to consider the lesser included offense of assault, which in this case would be kind of odd" given the evidence. Koller did not object to the prosecutor's remarks.

During Koller's testimony at the hearing on the new trial motion, Upton raised the issue of alleged prosecutorial error in argument based on *People v. Kurtzman* (1988) 46 Cal.3d 322, 335 (*Kurtzman*).[38] Upton asked Koller if he had a tactical reason for not objecting to the prosecutor's "misstatement" of CALCRIM No. 3517. Koller responded, "I believe that the Court had properly instructed on that issue, and felt that highlighting [the prosecutor]'s [remarks] was not necessary."

Later, when orally arguing the motion, Upton reiterated that the prosecutor's remarks "constitute[d] a *Kurtzman* error, and it had a prejudicial impact on this case, particularly with regard to the [offenses in counts 7 and 8 under section] 136.1(c)(1)."

Gonzalez does not point us to any mention of *Kurtzman* error made in his written new trial motion or reply to the district attorney's opposition. Moreover, the trial court did not address this particular claim of error in its written decision on Gonzalez's motion. However, the court stated in its written ruling: "As to any claim or argument or basis

---

[38] In *Kurtzman*, the California Supreme Court addressed a situation in which the trial court told the jury "that it must unanimously agree on whether defendant was guilty of second degree murder before 'considering' voluntary manslaughter." (*Kurtzman*, *supra*, 46 Cal.3d at p. 324.)

82

asserted in support of the motion for new trial not specifically discussed herein, the motion is denied."

### b. Standard of Review and Other Legal Principles

As discussed, *ante*, we use the *Taylor* mixed-standard of review when evaluating a trial court's denial of a new trial motion alleging an IAC claim. (*Taylor*, *supra*, 162 Cal.App.3d at pp. 724–725.)

In *Kurtzman*, the California Supreme Court held "that a court may 'restrict [] a jury from *returning a verdict* on a lesser included offense before acquitting on a greater offense' but may not 'preclude [it] from *considering* lesser offenses during its deliberations.' (Italics in original.) We thereby impliedly rejected a 'strict acquittal-first rule under which the jury must acquit of the greater offense before even considering lesser included offenses.' " (*People v. Berryman* (1993) 6 Cal.4th 1048, 1073 [quoting *Kurtzman*, *supra*, 46 Cal.3d at p. 333], overruled on another ground by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

As for prosecutorial error, "it is misconduct for a prosecutor, during argument, to misstate the law." (*People v. Whalen* (2013) 56 Cal.4th 1, 77, disapproved of on another ground by *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.) " 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) We accord " 'substantial deference' " to counsel's tactical decisions and " 'will not second-guess trial counsel's reasonable tactical decisions.' " (*Riel*, *supra*, 22 Cal.4th at p. 1185; see also *Coddington*, *supra*, 23 Cal.4th at p. 652.)

### c. Analysis

Gonzalez asserts that Koller acted unreasonably when he withheld objection to the prosecutor's argument for the reasons he articulated, i.e., because the trial court's instruction on lesser included offenses was proper and he believed it was unnecessary to

highlight the prosecutor's remarks. Gonzalez further maintains that Koller's failure to object was prejudicial as to the convictions on counts 7, 8, and 9.

We are not persuaded that the reasons Koller provided for his failure to object places his performance outside the range of reasonably professional assistance. As Gonzalez concedes, the trial court's instruction with CALCRIM No. 3517 was correct. Further, the trial court instructed the jurors that if they "believe that the attorneys' comments on the law conflict with [the court's] instructions, you must follow [the court's] instructions." (CALCRIM No. 200.) Although the prosecutor arguably contradicted the court's instruction by arguing that the jurors should only consider the lesser included offenses if they first decided to acquit on the charged offenses, the prosecutor concurrently urged the jurors to "follow the evidence" to a conclusion that the People proved Gonzalez's guilt on the offenses as charged. In this circumstance, it would not be unreasonable for an attorney to conclude that the jurors would follow the direction in CALCRIM No. 3517 that they could decide the order for consideration of the offenses and relevant evidence. (See *Centeno*, *supra*, 60 Cal.4th at p. 676.)

Moreover, in his closing argument, Koller did not ask the jurors to return a guilty verdict on any lesser included offense. Rather, Koller urged the jurors to find Gonzalez not guilty on counts 6 through 9, and further asked the jurors to "look at that evidence and make [a] determination" on count 15 (methamphetamine possession for sale). Given the chosen strategies of persuading the jurors to completely acquit Gonzalez on counts 6 through 9, given the People's failure of proof, and essentially conceding guilt on count 15, from the defense perspective the importance of the prosecutor's remarks regarding the jury's consideration of the lesser included offenses was minimal. Under these circumstances, we conclude that Gonzalez fails to show Koller's reason for withholding an objection is unreasonable or that Koller's inaction—evaluated "from counsel's perspective at the time"—amounts to deficient performance. (See *Strickland*, *supra*, 466 U.S. at p. 689.)

We thus reject Gonzalez's claim that the trial court erred by denying his new-trial motion IAC claim grounded on prosecutorial error in argument.

F. *Sentencing Claims*

Although we have already concluded that Gonzalez's sentence should be vacated in its entirety based on our reversal of some of his convictions, for the benefit of the trial court at resentencing we address Gonzalez's claims of sentencing error with respect to counts and enhancements that we have not ordered vacated. Gonzalez contends (1) the concurrent sentence imposed for his robbery conviction (count 9) must be stayed under section 654; and (2) a post-trial change made to section 1170, subdivision (b), by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) requires vacatur of the sentence for his attempted murder conviction (count 5).[39]

1. Robbery

Gonzalez contends the trial court erred under section 654 by imposing an unstayed concurrent sentence on count 9 for his robbery conviction related to the home invasion.

a. Legal Principles

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Assad* (2010) 189 Cal.App.4th 187, 200.) Even concurrent sentences on convictions subject to section 654 are prohibited; the sentence on one of the two applicable convictions must be imposed and then stayed. (*People v. Deloza* (1998)

---

[39] Gonzalez also contends that the enhanced seven-years-to-life sentences imposed on counts 7 and 8 must be vacated because the jury did not expressly find that the dissuasion underlying his convictions on those counts was accompanied by "threats" (in contrast to "force"), as allegedly required by section 186.22, subdivision (b)(4)(C). Because we have already concluded that, under Assembly Bill 333, the jury's section 186.22(b) gang enhancement findings on counts 7 and 8 cannot stand (section II.B.5., *ante*), we need not address Gonzalez's additional claim about the need for a jury finding under section 186.22, subdivision (b)(4)(C). We express no opinion on this issue and leave it to the parties and trial court to address as necessary on remand, should the district attorney decide to retry the enhancement allegation under section 186.22, subdivision (b)(4)(C).

18 Cal.4th 585, 591–592.) "[T]he purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

Application of section 654 "requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Only if the case involves more than one act does a court consider whether the case involves a course of conduct. (*Ibid*.) "At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act." (*Id*. at p. 312.) "Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Id*. at p. 313.) If the convictions involve more than one act, the court reaches "step two of the section 654 analysis: whether the [course of conduct] involved multiple intents and objectives." (*Id*. at p. 316.)

At step two, whether crimes arise from an indivisible course of conduct turns on the perpetrator's intent and objective, not the temporal proximity of his or her crimes. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State* (1960) 55 Cal.2d 11, 19, overruled in part on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 341.) Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of section 654 to settled facts is a question of law. (*Harrison*, at p. 335.) We review the record for substantial evidence to support implied findings sufficient to uphold the sentence under section 654. (See *People v. Osband* (1996) 13 Cal.4th 622, 730–731.)

b. Analysis

At trial, Gonzalez requested that his punishment on count 9 be stayed under section 654, as related to count 7. For count 9, the trial court imposed a midterm sentence of three years and ten years consecutive for the gang enhancement under section 186.22, subdivision (b)(1)(C), for a total of 13 years concurrent. The court explained that it imposed a concurrent midterm sentence because the offense involved "the same course of conduct as in Count[s] 7 and 8 and did appear to be an afterthought as the parties were leaving the residence." Regarding count 10 (burglary), the court imposed a consecutive sentence "because the purpose of the entry of the home was to commit a theft"— presumably referring to the intent to steal the incriminating letter.

On appeal, Gonzalez relies principally on *People v. Bradley* (2003) 111 Cal.App.4th 765 (*Bradley*) to argue that, because his liability for the robbery committed by his coconspirator Juan Garcia was based on the theory that the robbery was a foreseeable consequence of the objective of the conspiracy (i.e., "to ensure that the letter did not wind up in the hands of the authorities"), Gonzalez may not be separately punished for the robbery offense.

In *Bradley*, the defendant was a young woman who agreed to participate in a scheme to entice a "prosperous looking customer" at a casino into leaving with her "so her two male accomplices could rob him" and their plan was for her "to persuade the target to take her in his car" and "then get him to stop somewhere along the way." (*Bradley*, *supra*, 111 Cal.App.4th at p. 767.) The defendant was convicted of robbery as an aider and abettor and of attempted murder as a natural and probable consequence of the robbery she aided and abetted. (*Id.* at pp. 767–769.) The trial court imposed consecutive sentences for the two offenses. (*Id.* at p. 767.) The appellate court explained that the defendant "had only one objective and one intent—to aid and abet a robbery of the victim" (*id.* at p. 768) and, because she was waiting in another vehicle when the victim was shot, she was "unaware that second crime was occurring until after it was

87

completed and thus didn't have an opportunity to prevent or even protest its commission. As a result, there simply was no evidence [defendant] exhibited the more dangerous mental state warranting a consecutive sentence under [section] 654." (*Id*. at p. 771.)  The court concluded that "[section] 654 denies the trial court discretion to impose consecutive sentences on [defendant] for the robbery and attempted murder convictions." (*Id*. at p. 770.)

We are not persuaded that the present case is like *Bradley*.  Here, Gonzalez wrote in his kite that "[o]n the way out [Garcia] grabbed her [purse]."  From this admission and other evidence concerning Crystal Martinez's descriptions of the home invasion, the trial court could have reasonably inferred that Gonzalez was aware of the robbery as it occurred and could have done something about it before he and his cohorts left the home. Simply put, the trial evidence includes substantial evidence of separate objectives harbored personally by Gonzalez during the home invasion.  (See *People v. Cummins* (2005) 127 Cal.App.4th 667, 682; *People v. Nguyen* (1988) 204 Cal.App.3d 181, 189–190.)

Accordingly, we conclude the trial court's implied determination that section 654 did not bar multiple punishment for the robbery conviction is sufficiently supported by the evidence and the robbery sentence on count 9 need not be stayed.

### 2.  Attempted Murder

Gonzalez contends a post-trial legislative change to section 1170, subdivision (b) (hereafter section 1170(b)) requires vacatur of the sentence on count 5.

For that count, the trial court instructed the jury "James Gonzalez is charged in Count 5 with attempted murder.  [¶]  To prove that he is guilty of attempted murder, the People must prove that:  [¶]  1. James Gonzalez took at least one direct but ineffective step toward killing Curtis Garza;  [¶]  AND  [¶]  2. James Gonzalez intended to kill Curtis Garza."  The instruction also defined "direct step," but did not specify that the jury must find more than one direct step.  In connection with the allegation attached to count 5 that

88

Gonzalez personally used a deadly weapon (§ 12022, subd. (b)(1)), the jury was instructed that it needed to determine whether Gonzalez "personally used a deadly weapon" during the commission of the attempted murder.

With respect to the sentence on count 5, the trial court stated it was imposing the upper term of nine years. It selected the upper term "because of the violence involved, multiple stab wounds, and that the victim was not armed."

In October 2021, while Gonzalez's appeal was pending in this court, Senate Bill 567 amended section 1170. (Stats. 2021, ch. 731, § 1.3.) Taking effect on January 1, 2022, section 1170, as amended, includes a new subdivision, (b)(2), which provides, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

The Attorney General concedes that the amendments made by Senate Bill 567 to section 1170, subdivision (b) apply to Gonzalez. We agree. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039 (*Flores*); see also *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308.)

Regarding the remedy, Gonzalez contends that we should vacate his sentence and remand for a new sentencing hearing because, in the absence of a jury finding, his upper-term sentence on count 5 "cannot stand no matter what the evidence may show in the record." By contrast, the Attorney General argues that no remand for resentencing is necessary because the record shows, beyond a reasonable doubt, that the jury, if properly instructed, would have found true the aggravating factors relied on by the trial court. Because we otherwise vacate Gonzalez's sentence entirely and remand the matter for full resentencing (see *Navarro*, *supra*, 40 Cal.4th at p. 681; *Buycks*, *supra*, 5 Cal.5th at p. 893), we need not address the dispute between the parties regarding whether the

absence of a jury finding on the circumstances in aggravation here requires a remand for resentencing or was harmless error.

Furthermore, we need not address the Attorney General's assertion that, on remand, the district attorney should be "given the election of proceeding under the new version of Penal Code section 1170, subdivision (b), or accepting resentencing." Rather, we direct the trial court at Gonzalez's resentencing to impose a new sentence on count 5 in accordance with Senate Bill 567. We express no opinion regarding the district attorney's potential elections at resentencing or the trial court's application of new section 1170, subdivision (b), leaving it to the trial court to determine Gonzalez's appropriate sentence in the first instance. (See *Flores*, *supra*, 73 Cal.App.5th at p. 1039.)

G. *Summary of Conclusions*

For the benefit of the parties and trial court, we summarize our conclusions:

Count 1 (street terrorism) is reversed for instructional error and, on remand, the district attorney may elect to retry Gonzalez this count. (See section II.B.4., *ante*.)

Count 11 (criminal threats) is reversed for instructional error and, on remand, the district attorney may elect to retry Gonzalez on this count as charged or accept a reduction of the conviction to the lesser offense of attempted criminal threat. (See section II.B.2., *ante*.)

Counts 12 and 13 (conspiracy) are reversed for instructional error and, on remand, the district attorney may either retry both counts 12 and 13 or accept the jury's conviction and any true findings on attached allegations on one of those two counts, after which the other count and its attached allegations shall be dismissed. (See section II.B.1., *ante*.)

The convictions on the remaining counts are affirmed.

The true findings on the gang enhancement allegations attached to counts 5–11 (§ 186.22, subd. (b)) are reversed. On remand, the district attorney may retry these gang enhancement allegations under the law as amended by Assembly Bill 333. (See section II.B.5., *ante*.)

90

Gonzalez's sentence is vacated entirely, and the trial court must fully resentence Gonzalez upon the conclusion of any further proceedings on remand. (See section II.B.1.c., *ante*.)

Regarding the sentence on count 5, we direct the trial court at Gonzalez's resentencing to impose a new sentence on that count under the law as amended by Senate Bill 567. (See section II.F.2., *ante*.)

As the gang enhancements attached to counts 5–11 have been reversed, they cannot be used to enhance Gonzalez's sentence on those counts at his resentencing absent retrial and in accordance with the jury findings at that proceeding.

## III. DISPOSITION

The convictions on counts 1, 11, 12, and 13 are reversed. The true findings on the gang enhancement allegations attached to counts 5–11 are reversed. The convictions on the remaining counts and the true findings on the remaining enhancements are affirmed.

Gonzalez's sentence is vacated in its entirety, and the matter is remanded to the trial court for a possible retrial on counts 1, 11, 12, and/or 13 and the gang enhancement allegations (Pen. Code, § 186.22, subd. (b)) attached to counts 5–11. As to counts 12 and 13 (conspiracy), if the prosecutor elects not to retry those counts, the trial court shall provide the prosecutor the opportunity to accept the jury's previous conviction and true allegation findings on either count 12 or count 13 and then reinstate the conviction and allegation findings on the count the prosecutor accepts and dismiss the other count and its attendant allegations. If the prosecutor elects not to retry Gonzalez, or at the conclusion of any retrial, the trial court is directed to resentence Gonzalez in a manner consistent with this opinion.

_____
                    Danner, J.

WE CONCUR:


_____
Elia, Acting P.J.


_____
Grover, J.


**H046836**
*People v. Gonzalez*